James **REEDER**, Petitioner,

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

Nos. 86–1045, 86–1536, 86–1607, 86–1623 and 87–1181.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 11, 1988.

Decided Jan. 24, 1989.

---

James R. Bayes, with whom Richard E. Wiley, Washington, D.C., was on the briefs, for petitioners James Reeder and L.M. Communications, Inc. in Nos. 86–1045 and 86–1623. Edward W. Hummers, David G. Rozzelle, Dan J. Alpert and Merilyn Strailman, Washington, D.C., also entered appearances for petitioners James Reeder, et al.

James K. Edmundson, with whom Mark Van Bergh, Washington, D.C., was on the brief, for petitioners Roxboro Broadcasting Co., et al. in No. 86–1607.

Julian P. Freret, Washington, D.C., for petitioner JAB Broadcasting, Inc., et al. in No. 87–1181. Christopher D. Imlay, Washington, D.C., also entered an appearance for JAB Broadcasting, Inc., et al.

Robert W. Healy was on the brief for petitioner Marine Broadcasting Corp. in No. 86–1536.

David Silberman, Counsel, Federal Communications Com'n, Washington, D.C., with whom Diane S. Killory, General Counsel, Daniel M. Armstrong, Associate General Counsel, F.C.C., Charles F. Rule, Asst. Atty. Gen., and Robert B. Nicholson and Marion L. Jetton, Attorneys, Washington, D.C., Dept. of Justice, were on the brief,

for respondents in 86–1045, 86–1536, 86–1607, 86–1623 and 87–1181. John J. Powers, III, Robert J. Wiggers, Washington, D.C., and David Seidman, Attorneys, Dept. of Justice, also entered appearances for respondents.

Dennis P. Corbett, with whom Steven A. Lerman and Laura B. Humphries, Washington, D.C., were on the brief, for intervenor Capitol Broadcasting Corp. in No. 87–1181.

Gary S. Smithwick, Washington, D.C., entered an appearance for intervenor, Winfas, Inc. in No. 86–1536.

Howard W. Simcox, Washington, D.C., entered an appearance for Intervenor, Semora FM, Inc. in No. 86–1607.

Matthew H. McCormick, Washington, D.C., entered an appearance for Intervenor, Triple H Broadcasting, Inc., in No. 87–1181.

Before EDWARDS and WILLIAMS, Circuit Judges, and REYNOLDS *, Senior District Judge.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

In 1983, the Federal Communications Commission ("FCC" or "Commission") authorized three new intermediate classes of FM stations having less restrictive mileage separation requirements than existing higher class channels. The creation of the new classes allowed the FCC to allot nearly 700 new FM channels throughout the United States. The change also made it possible for some existing low class FM stations to increase their broadcast area by upgrading to a new intermediate class channel without violating mileage separation requirements. Normally, new FM channels are allotted in individual rulemaking proceedings; however, in this case the Commission decided to allocate all of the new channels pursuant to a single nationwide omnibus rulemaking.

The consolidated petitions for review in this case involve several different challenges to the FCC's actions in the course of the omnibus proceeding. First, petitioners James A. Reeder ("Reeder"), L.M. Communications, Inc. ("L.M."), and Marine Broadcasting Corporation ("Marine") challenge the FCC's adoption of special rules governing the submission of counterproposals during the omnibus rulemaking. These rules prevented the petitioners from advancing counterproposals that would have enabled the petitioners to upgrade low class FM stations. Because we find that the FCC failed to provide adequate notice and opportunity to comment before adopting the counterproposal rules, we grant the petitions for review of petitioners Reeder, L.M. and Marine.

Second, petitioners Roxboro Broadcasting Co. ("Roxboro") and LCH Broadcasting Group, Inc. ("LCH"), challenge the FCC's determination during the rulemaking proceeding that Semora, North Carolina, is a "community" within the meaning of the Communications Act and that Semora, rather than South Boston, Virginia, should receive one of the new radio frequencies. We find that the FCC failed to engage in reasoned decisionmaking when it allotted an FM channel to Semora; therefore, we grant the petitions of petitioners Roxboro and LCH.

Third, petitioner JAB Broadcasting ("JAB") challenges the FCC's decision to allot a frequency to Pensacola, Florida, frustrating JAB's upgrade plans. Because we find no merit in this claim, we reject JAB's petition for review. JAB not only had adequate notice and an opportunity to comment, but its counterproposal was also considered and rejected on the merits.[1]

## I. BACKGROUND

### A. *The Omnibus Proceeding*

The use of commercial FM frequencies is governed by the "Table of FM Allotments" provided for in 47 C.F.R. § 73.202(b) (1987),

---

* Of the United States District Court for the Eastern District of Wisconsin, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The petition of James R. Coursolle has been dismissed at the petitioner's request.

which lists the communities in which FM stations are operating or may operate, along with the channels on which the stations in each community must transmit. To add a new FM station or to change the channel on which an existing station operates, the Table of FM Allotments must be amended through a rulemaking proceeding. *See id* §§ 1.411–.420. The FCC's rules governing such proceedings allow interested parties to submit comments and counterproposals. *See id.* §§ 1.415(a), 1.420(d).

Prior to 1983, the FCC authorized only three classes of commercial FM stations: Class A stations, which operate on twenty designated channels and have a service radius of approximately fifteen miles, and Class B or Class C stations, depending on the region of the country, which operate on the remaining sixty channels and have a service radius of forty or fifty miles, respectively. In 1983, the FCC authorized three new intermediate classes of FM stations with less restrictive mileage separation requirements than the higher class channels B and C. *See Report and Order (BC Docket No. 80–90)*, 94 F.C.C.2d 152, 153 (1983). These new channels made it possible to authorize nearly 700 new FM stations. As an incidental effect, the creation of the new channels also opened the possibility that some low-power Class A stations could upgrade their coverage to an intermediate channel without violating mileage separate requirements, as they would have done if they had upgraded to a high-power Class B or C channel.

Because of the enormous number of potential new stations, the Commission decided to make the new allotments in a single omnibus rulemaking proceeding, rather than in individual rulemakings, which are typically used to allot FM channels. The FCC initiated the rulemaking on March 14, 1984, when it offered for comment proposed channel allotments to 684 communities. *See* Notice of Proposed Rulemaking, MM Docket No. 84–231, 49 Fed.Reg. 11,214 (1984) ("Notice"). These communities were chosen with the aid of a computer that was programmed to allot as many new channels as possible without violating mileage separation requirements and, where feasible, to allot the new channels to communities with the greatest need for an additional broadcast station.

Because a change in the allotment to one community could lead to interference with the channel allotted to a second nearby community, potentially causing a ripple effect throughout the nation, the FCC announced in the Notice that it was adopting special rules governing the consideration of counterproposals (*i.e.*, proposals for alternative or mutually exclusive channel allotments). To be considered in the omnibus proceeding, a counterproposal was required to be mutually exclusive with a proposed channel allotment *and* to fit one of five categories: "(a) First or second aural service; (b) First local service; (c) First full-time local service; (d) Minority service; [or] (e) Public radio service." 49 Fed.Reg. at 11,216 (footnotes omitted). Any counterproposal that did not fit these criteria would "not be considered in the context of this omnibus proceeding. Instead, the request will be returned without prejudice and may be refiled at the conclusion of this docket." *Id.*

In response to the Notice, the Commission received hundreds of counterproposals, of which roughly 200 were returned as unacceptable. The Commission explained:

> The majority of unacceptable counterproposals were returned because they involved a Class A station desiring to upgrade. The Commission generally favors such increases in service. However, an increase in coverage for an existing station is usually not of the same import as the provision of new local service.

*First Report and Order (MM Docket No. 84–231)*, 100 F.C.C.2d 1332, 1337 (1985) (footnote omitted) (*"First Report and Order "*). After considering the counterproposals that did meet the special criteria, along with other comments, the FCC released its *First Report and Order*, which amended the Table of FM Allotments to add 689 new channels.

The Commission received fifty-seven petitions for reconsideration in response to

the allotments announced in the *First Report and Order;* many of these petitions proposed to substitute different channels for those allotted so as to permit an existing station to upgrade without violating mileage separation requirements. The petitions to substitute were fully consistent with existing FCC rules governing allotment proceedings. Nonetheless, on November 8, 1985, the FCC issued a *Memorandum Opinion and Order (MM Docket No. 84–231),* 59 Rad.Reg.2d (P & F) 679 (1985) (*"First Reconsideration Order"*), rejecting the petitions proposing substitutions, explaining that they did not meet the special counterproposal criteria. Acknowledging that substitutions had been "routinely approved" in the past, the Commission announced that it would not make substitutions for the 689 channel allotments "without a compelling showing of need or a showing of Commission error." *Id.* at 680.

The FCC subsequently received twenty-eight petitions for reconsideration of the *First Reconsideration Order,* most of which objected to the decision not to allow substitutions without a showing of need or error. In a second *Memorandum Opinion and Order (MM Docket No. 84–231),* 61 Rad.Reg.2d (P & F) 26 (1986) (*"Second Reconsideration Order"*), the FCC acknowledged that the no-substitutions policy was a departure from past practice, but claimed that the Commission was justified in "adopting the compelling need requirement without notice and comment" because the rule was merely procedural. *Id.* at 28.

The *Second Reconsideration Order* also explained that "the compelling need showing was never intended to be a permanent requirement with respect to changes in the omnibus allotments." *Id.* at 29. Under the FCC's plan to distribute the new channels, the Commission had established random "window" periods for allotted channels. In the *Second Reconsideration Order,* the Commission announced that when the "window" period for a particular allotment closed, the Commission would not require a compelling need showing before considering petition proposing to substitute a channel for that allotted; rather, the FCC would accept such petitions if the proposed channel could be used at the site specified by each of the license applicants for the channel originally allotted. However, this created an impossible situation for some broadcasters whose counterproposals required substitutions for more than one allotment: first, these broadcasters were foreclosed from filing counterproposals until all of the windows for the allotments in question opened and closed, because they could not satisfy the compelling need requirement; then, when the final window period closed, and the compelling need requirement was no longer applicable, a license would have already been granted and broadcasting begun on the channel specified in the first allotment, making it impossible for the broadcaster to substitute a different channel for that allotment. Thus, these broadcasters faced a Catch–22 that prevented them from pursuing their upgrade plans even after the omnibus proceeding was over.

### B. *Reeder, Marine and L.M.*

Petitioners Reeder, Marine and L.M. all have an interest in upgrading existing FM stations. At different points in the process outlined above, these petitioners submitted counterproposals asking the FCC to substitute channels for those proposed or allocated. The Commission rejected their counterproposals on the grounds that the petitioners did not meet the criteria specified in the original *Notice* and had not made a compelling showing of need or Commission error. Reeder and L.M., and possibly Marine, were prevented from advancing their counterproposals at a later stage due to the Catch–22 described above. The petitioners now ask this court to review the Commission's refusal to consider their proposals on the merits.

### C. *Roxboro and LCH*

In the original *Notice,* the FCC proposed an allotment for South Boston, Virginia. Ansun Broadcasting Co. ("Ansun") then filed a counterproposal, requesting that the Commission instead allot the channel to Semora, North Carolina, which is about

twenty miles from South Boston. Ansun argued that Semora should be given the allotment because, unlike South Boston, Semora has no local radio service.

Petitioner Roxboro is the licensee of AM and FM stations in Roxboro, North Carolina, which is about thirteen miles from Semora. An FM station in Semora would be in direct competition with Roxboro for audience and revenue. Petitioner LCH is the licensee of an AM station in South Boston. LCH's predecessor in interest had expressed an intent to apply for a permit to operate a new station in South Boston if the channel were allotted to that community. LCH and Roxboro both filed separate reply comments opposing Ansun's counterproposal, arguing that Semora was not a "community" within the meaning of section 307(b) of the Communications Act, 47 U.S.C. § 307(b) (1982), and therefore was not entitled to a preference over South Boston.

After first rejecting Ansun's counterproposal for unrelated reasons, the FCC eventually granted the petition, withdrew the South Boston allotment, and allotted the channel to Semora. *First Reconsideration Order*, 59 Rad.Reg.2d at 696. The Commission did not address the contention of Roxboro and LCH that Semora was not a community. Roxboro and LCH filed separate petitions for reconsideration, again disputing Semora's status as a community. They also argued that, under the FCC's "quiet village" doctrine, even if Semora were a community, Semora could not receive preference over South Boston, because the latter had a much larger population. The FCC denied the petitions, finding that Semora was a community, without addressing the quiet village issue. *Second Reconsideration Order*, 61 Rad.Reg.2d at 31. LCH and Roxboro petitioned for review.

### D. *JAB*

Prior to the omnibus rulemaking proceeding, intervenor Capitol Broadcasting Corporation ("Capitol") was granted a li-

cense to operate a high-power Class C station. However, Capitol had difficulty finding a site at which it could use the high antenna needed to operate a Class C station. Capitol finally found an acceptable site, but Capitol could not broadcast there without interfering with the channel that had been allotted to Gulf Breeze, Florida, prior to the omnibus rulemaking. A different channel, channel 291A, could have been allotted to Gulf Breeze, but in the *First Report and Order*, the FCC had proposed to allot that channel to Pensacola, Florida, about ten miles away. Capitol filed a counterproposal to the Pensacola allotment, asking the FCC to allot channel 291A to Gulf Breeze and to allot a different channel to Pensacola. The Commission published Capitol's counterproposal for public comment. Petitions for Reconsideration of Actions in Rulemaking Proceedings, 50 Fed. Reg. 11,940 (1985).

Capitol's proposed substitution for Pensacola would have precluded petitioner JAB from upgrading its station in Chickasaw, Alabama.[2] JAB did not oppose Capitol's petition, however, because the public notice had mentioned only Gulf Breeze and not Pensacola, and JAB claimed that it was unaware that the counterproposal would affect its upgrade plans.

In the *First Reconsideration Order*, the FCC found that Capitol had made a compelling showing of need, and the Commission adopted Capitol's counterproposal. 59 Rad. Reg.2d at 687. JAB petitioned for reconsideration, arguing that it had not been given notice or an opportunity to comment. The Commission found that JAB did have adequate notice and that, even if JAB had filed a timely proposal, the proposal would have been rejected because it did not meet the counterproposal criteria. *Memorandum Opinion and Order (MM Docket No. 84–231)*, 2 F.C.C.Rcd. 1290, 1291 (1987). Moreover, the FCC stated that JAB had not been deprived of its right to oppose the Pensacola allotment on the merits because the Commission was giving it an opportuni-

---

**2.** JAB is the successor to EJM Broadcasting, which owned the station in question during most of the events leading to this appeal. For simplicity, "JAB" will be used to refer to both EJM and JAB.

ty to do so in the reconsideration petition. *See id.* Addressing the substance of JAB's petition, the Commission found that the allotment to Pensacola was preferable to JAB's counterproposal because Capitol's proposal allowed Pensacola to operate with an intermediate Class C2 station, rather than with the lower Class A channel assigned in the original allotment. *See id.* JAB petitioned this court for review.

## II. DISCUSSION

### A. *The Counterproposal Rules*

■ Reeder, L.M. and Marine raise a number of challenges to the FCC's refusal to consider their counterproposals. The principal claim of all three petitioners, however, is that the FCC did not follow the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b), (c) (1982), in the rulemaking proceeding used to allot the new intermediate FM channels. We agree with the petitioners that the procedure by which the FCC adopted the so-called interim counterproposal rules did not comply with the requirements of the APA.

First, the FCC did not provide adequate notice. By the Commission's own admission, *see First Reconsideration Order,* 59 Rad.Reg.2d at 680, the FCC has had a longstanding policy of permitting channel substitutions in order to accommodate upgrade plans. The Notice initiating the omnibus rulemaking, however, gave no indication that the FCC was planning to abandon this policy in the context of that proceeding. Although the Notice did indicate that the agency would not consider counterproposals that did not meet certain public interest criteria, it made no mention of the substitution policy, and did not alert the petitioners to the fact that the FCC was adopting procedures that would permanently foreclose their upgrade plans. The FCC's announced goal in the original Notice of allotting 684 new intermediate FM channels was not, on its face, mutually exclusive with the petitioners' desire to upgrade, and the petitioners thus had no indi-

cation that the FCC was changing its policy until the Commission expressly did so in the *First Reconsideration Order.*

Second, the FCC did not provide an adequate opportunity for comment. Although the original announcement of the counterproposal rules came in a Notice of Proposed Rulemaking, that Notice sought comment only on the proposed *allotments,* not on the rules governing the submission of counterproposals. Even if the implications of these rules had been clear, the rules were announced in the Notice as a *fait accompli,* without any indication that the FCC was soliciting comments from interested parties. The FCC's later receipt of complaints about the counterproposal rules does not change the fact that the Commission never invited comments or that it decided to adopt the rules irrespective of the complaints. *See McLouth Steel Prods. Corp. v. Thomas,* 838 F.2d 1317, 1323 (D.C. Cir.1988) (the curative effect of an opportunity to comment at a later stage "depends on the agency's mind remaining open enough at the later stage"). Similarly, when the FCC explicitly adopted the no-substitution rule, it did so in the *First Reconsideration Order,* which was just that—an order, not a proposal seeking comment. Again, the FCC received complaints in response, but the agency's mind was already made up when the rules were first announced.

■ Moreover, if we had any doubt about the inadequacy of the procedures followed by the FCC, it would be resolved by the Commission's own admission that it did not provide notice and an opportunity to comment. In response to complaints about the no-substitution rule, the Commission argued that it was "warranted both in adopting the compelling need requirement without notice and comment and modifying that requirement in this Order." *Second Reconsideration Order,* 61 Rad.Reg.2d at 28. The primary justification offered by the agency was that the rules were merely procedural and thus under the APA did not require notice and comment.[3] *See* 5 U.S.C.

---

3. The Commission briefly mentioned two other justifications for its failure to provide notice

§ 553(b)(A) (1982). Yet, the APA's procedural rule exception is to be construed very narrowly, and it does not apply where the agency "encodes a substantive value judgment." *See American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C.Cir.1987). In the instant case, it is quite obvious that the rules changed the substantive criteria for substitution and permanently foreclosed the petitioners from pursuing their upgrade plans. Moreover, on appeal, the Commission has made no attempt to argue that notice and comment were unnecessary.

Accordingly, we grant the petitions for review of petitioners Reeder, Marine and L.M. and remand the case for further proceedings. If the FCC chooses to reinstate the counterproposal rules after proper notice and comment, the court makes no judgment as to the merits of those rules. It may be that the magnitude and complexity of the omnibus allotment proceeding justify more restrictive arrangements for the handling of counterproposals. The very fact that the omnibus rulemaking proceeding affected such an enormous number of parties, however, highlights the importance of giving those parties adequate notice and an opportunity to comment before the rules go into place.

#### B. *Roxboro and LCH*

■ LCH and Roxboro argue that the FCC's decision to grant an allotment to Semora, North Carolina, over South Boston, Virginia, was inconsistent with Commission precedent. We agree that the Commission did not engage in reasoned decisionmaking in allotting the channel to Semora.

Under longstanding FCC and judicial interpretations of section 307(b) of the Communications Act, 47 U.S.C. § 307(b) (1982),[4] when competing applicants for an FM broadcast license propose to serve separate communities with differing broadcast needs, a dispositive preference is generally given to applicants who specify the community with the greater need for local broadcast service. *See, e.g., WHW Enterprises, Inc. v. FCC,* 753 F.2d 1132, 1135 (D.C.Cir. 1985). This preference does not apply, however, if the Commission determines that the place of license is not a "community" for section 307(b) purposes because it is not an identifiable population grouping with common local interests. *See, e.g., Amendment of Table of Allotments (Penacook, N.H.),* 2 F.C.C.Rcd. 459, 460 (Acting Chief, Policy & Rules Div. 1987).

The Commission rejected the petitioners' argument that Semora was not a community in a one paragraph opinion, noting that Semora has its own fire department, post office, social club, and businesses. *See Second Reconsideration Order,* 61 Rad. Reg.2d at 31. The Commission's cursory opinion, however, did not address the petitioners' claim that these establishments are not aimed primarily at local Semora residents but rather serve a wider geographic area, and thus are insufficient under FCC precedent to prove community status. *See, e.g., Amendment of Table of Assignments (Coker, Ala.),* 43 Rad.Reg.2d (P & F) 190, 193 (Chief, Broadcast Bureau 1978); *Amendment of Table Assignments (Vimville, Miss.),* 55 Rad.Reg.2d (P & F) 256, 258 (Chief, Policy & Rules Div.1983); *Amendment of Table of Allotments (Oak Beach and Bay Shore, N.Y.),* 57 Rad.Reg. 2d (P & F) 1275, 1277, 1279 (Chief, Policy & Rules Div.1985).

More importantly, the Commission completely failed to consider the applicability of the "quiet village doctrine." Under that doctrine, the FCC has refused to give very small communities a dispositive section 307(b) presumption in a multiple party proceeding. *See, e.g., Ruarch Assocs.,* 101 F.C.C.2d 1358 (1985); *Beacon Broadcast-*

---

and opportunity for comment, *see Second Reconsideration Order,* 61 Rad.Reg.2d at 28, but these reasons were neither explained in the FCC's decision nor pressed on appeal. We can find no merit whatsoever in these additional justifications (which may explain why they were not pursued on appeal).

**4.** Section 307(b) provides that the FCC "shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."

*ing,* 2 F.C.C.Rcd. 3469, 3471–72, *recon. denied,* 2 F.C.C.Rcd. 7562 (1987). Contrary to the Commission's argument before this court, there is absolutely no indication that the FCC intended to repeal that policy in the omnibus rulemaking proceeding.

According to the petitioners, Semora has a population of only 150, whereas South Boston has a population of 7,093. It would appear, therefore, that the quiet village doctrine precludes giving Semora a dispositive section 307(b) preference over South Boston. We decline to address the Commission's argument before this court that certain factors make the quiet doctrine inapplicable in the present case, because the *post hoc* rationalizations of counsel cannot substitute for reasoned decisionmaking by the agency. *See Western Union Corp. v. FCC,* 856 F.2d 315, 318 (D.C.Cir.1988).

Accordingly, the decision granting an allotment to Semora is vacated and remanded to the FCC for further consideration.

## C. *JAB*

 Finally, we deny JAB's petition for review. We need not decide whether JAB received adequate notice in the first instance, because the petitioner clearly received a full hearing on reconsideration. The Commission considered and denied JAB's petition on the merits, and JAB has not argued before this court that that decision was in any way arbitrary or capricious.[5]

### III. CONCLUSION

The petitions of Reeder, L.M. and Marine are granted. Accordingly, the case is remanded for proper notice and comment rulemaking on the so-called interim rules governing counterproposals for substitute channels. The petitions of Roxboro and LCH are also granted, and the decision allotting the channel to Semora is vacated and remanded for further consideration

consistent with this opinion. JAB's petition for review is denied.

SO ORDERED.

---

5. Furthermore, it appears that JAB subsequently received the upgrade it sought. *See Amendment of Table Allotments (Chickasaw, Ala. and Quit-* *man, Miss.),* 3 F.C.C.Rcd. 5217 (Dep'y Chief, Policy & Rules Div.1988).