Helen **NECKETOPOULOS, Stanley Kunitz, Bruce W. Konrad, John Rottkamp, Indra Anandasapapathy, and Massimo De Giarde, and 90 other Medicare claimants listed on Schedule "1" attached hereto, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

Donna E. **SHALALA, in her capacity as Secretary of the Department of Health and Human Services, and Bruce Vladeck, in his capacity as Administrator of the Health Care Financing Administration, Defendants.**

**No. 94 Civ. 1044 (MGC).**

United States District Court, S.D. New York.

Sept. 30, 1996.

Brown & Seymour & Craig A. Landy, New York City by Whitney North Seymour, Jr., Craig A. Landy, and Peter James Clines, for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York, New York City by Jeffrey Oestericher, Assistant United States Attorney, for Defendants (Annette H. Blum, Chief Counsel, Region II David Rawson, Assistant General Counsel, Department of Health and Human Services, of counsel).

*OPINION*

CEDARBAUM, District Judge.

This case involves claims for reimbursement for anesthesia services under Part B of the Medicare Program. In certain regions of the country prior to 1989, reimbursement was based, in part, on a patient's age and physical condition. In 1989, the Secretary of the Department of Health and Human Services issued a regulation which provided that reimbursement would no longer be based on these factors. Plaintiffs claim that when issuing the regulation, the Secretary exceeded her statutory authority, acted arbitrarily and capriciously, and failed to observe appropriate procedures. Plaintiffs have moved for summary judgment pursuant to Fed.R.Civ.P. 56 and for class certification. Defendants have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons that follow, plaintiffs' motion is denied and defendants' motion is granted.

*Undisputed Facts*

. Part B of the Medicare Program is a voluntary, federally subsidized program of supplemental medical insurance for the aged and disabled, generally reimbursing participants, or their assigned health care providers,[1] eighty percent of the reasonable cost of certain doctors' services, x-rays, lab tests and other medical services. 42 U.S.C. §§ 1395j–1395w–4 (1994). The Secretary, through the Health Care Financing Administration ("HCFA"), contracts with private insurance carriers to administer the Part B claims process. *See* 42 U.S.C. §§ 1395h & 1395u (1994); 42 C.F.R. § 421.5 (1995).

Prior to March 1, 1989, Medicare carriers calculated the reasonable charge for anesthesia services based on three types of "relative value" units: "base" units which correlated to the specific procedure performed; "time"

1. Physicians who accept assignment under Part B agree to accept the level of charges approved by Medicare in full satisfaction for their services, receiving payment of eighty percent of such approved charges directly from the carrier. The beneficiary is liable for the remaining twenty percent of the approved charges. 42 U.S.C. § 1395u(b)(3)(B)(ii) (1994).

Prior to January 1, 1991, a physician who did not accept assignment was generally free to charge the patient the physician's usual and customary charge for the service rendered without regard to the amount of the Medicare approved charge. After that date, charges to be paid by the beneficiary were restricted to a specified percentage above the Medicare-approved charge, known as the "limiting charge" or "recognized payment amount." *See* 42 U.S.C. § 1395w–4(g) (1994).

units which represented the length of time during which anesthesia services were provided; and "modifier" units which represented special factors such as the age or physical condition of the patient. The reasonable charge for a particular procedure was calculated by multiplying the total number of relative value units by a dollar conversion factor. Prior to March 1, 1989, Medicare carriers used several different relative value guides for anesthesia services. Sixty-five percent of carriers recognized modifier units, and among those, modifier unit policies varied.

On December 22, 1987 Congress passed the Omnibus Budget Reconciliation Act of 1987 ("OBRA 1987"), Pub.L. No. 100–203, 101 Stat. 1330 (1987). Section 4048(b) of OBRA 1987 provides that:

> The Secretary of Health and Human Services, in consultation with groups representing physicians who furnish anesthesia services, shall establish by regulation a relative value guide for use in all carrier localities in making payment for physician anesthesia services furnished under part B of title XVIII of the Social Security Act on and after January 1, 1989. Such guide shall be designed so as to result in expenditures under such title for such services in an amount that would not exceed the amount of such expenditures which would otherwise occur.

101 Stat. at 1330–90. In June and August of 1988, HCFA officials met with representatives of the American Society of Anesthesiologists ("ASA"). (Pls.' 3(g) Statement ¶¶ 29–30; Defs.' Resp.Pls.' 3(g) Statement ¶¶ 8–9.) ASA proposed a relative value guide that included modifier units. ASA later amended its proposal to define more precisely the specific conditions that would warrant modifier units. 54 Fed.Reg. 3,794, 3,796 (1989).

On January 26, 1989, the Secretary issued a notice of the proposed interim rule to implement section 4048(b). 54 Fed.Reg. 3,794

(codified at 42 C.F.R. § 405.553 (1990)). The proposed uniform relative value guide, scheduled to take effect on March 1, 1989, eliminated modifier units.[2] Interested persons were given until February 27, 1989 to submit comments.

In the notice of the proposed interim rule, the Secretary stated that it was her belief that elimination of modifier units would not have a substantial adverse effect on individual anesthesiologists. Approximately thirty-five percent of Medicare carriers did not recognize modifier units, and anesthesiologists in those carrier areas would not experience any change. In addition, modifier units were a relatively minor portion of the total number of relative value units for anesthesia services. Finally, modifier units would be significant only if there were substantial differences in the distribution of patients among anesthesiologists. This would occur if, for example, there were anesthesiologists who consistently see patients who qualify for modifier units more than other anesthesiologists in the same area. Although the ASA contended that anesthesiologists in some hospitals, particularly teaching hospitals, are more likely to see patients who qualify for modifier units, the Secretary noted that there was no evidence that this was the case to any substantial degree. To the extent that there are differences in patient mix, the Secretary noted that such differences are already largely accounted for by differences in base and time units. *Id.* at 3796–97.

The notice of the proposed interim rule stated two additional considerations that influenced the decision to eliminate modifiers. First, the Secretary was concerned that budget neutrality could not be preserved if the ASA's proposed modifier unit policy were adopted. The Secretary pointed out that it would be difficult for each carrier to estimate the number of modifier units that would be reimbursed under a new modifier unit policy.

---

**2.** 42 C.F.R. § 405.553 (1990) provided, in relevant part:

(e) *Use of a uniform relative value guide—*

(1) *General rule.* For anesthesia services furnished by an anesthesiologist on or after March 1, 1989, the amount of payment for the service is determined based on a uniform relative value guide.

(2) *Selection of a uniform relative value guide.* The uniform relative value guide used is the 1988 American Society of Anesthesiologists' Relative Value Guide except that— ...

(ii) Modifier units are not recognized....

Second, the Secretary was concerned that continuing to recognize modifiers might establish a precedent for other specialties. *Id.* at 3797.

In February 1989, the Secretary issued a modification to the Medicare Carriers Manual instructing carriers not to recognize modifier units after March 1, 1989. (Pls.' 3(g) Statement ¶ 23; Defs.' Resp.Pls.' 3(g) Statement ¶ 3.) The interim rule, which eliminated modifiers, took effect on March 1, 1989.

On August 7, 1990, the Secretary issued a notice of the final rule implementing section 4048(b). 55 Fed.Reg. 32,078 (1990) (codified at 42 C.F.R. § 405.553 (1991)). The final rule, which took effect on September 6, 1990, also eliminated modifier units.[3] In the notice of the final rule, the Secretary responded to the hundreds of comments she had received in response to the notice of the proposed interim rule. The majority of the comments came from anesthesiologists who argued that modifier units better measured anesthesia risk and the complexity of the illness, and thus made the system patient specific and more appropriately compensated for increased anesthetic risk. *Id.* at 32,081–82. The Secretary reiterated the concerns discussed in the notice of the proposed interim rule and added that "the use of modifier units appears to be subjective and difficult for carriers to validate in claims review operations without substantial cost and effort." *Id.* at 32,079. The Secretary also noted that several organizations had recommended the elimination of modifier units and that the modifier unit policy prior to March 1, 1989 may have overvalued some anesthesia services. *Id.* at 32,082.

The Secretary concluded that, other than anecdotal evidence, there was no evidence that anesthesiologists in teaching hospitals or tertiary care centers or who specialize in cardiac anesthesia or who treat more complex cases would be significantly disadvantaged by the elimination of modifiers. *Id.* One state anesthesiology society indicated that the elimination of modifier units would be balanced by the payment of time units

because those factors that are the basis for modifier units are generally factors that contribute to the length of time required for an anesthesia procedure. (Admin.Rec. at 279.) Moreover, the Secretary noted that carriers in the New England and Middle Atlantic regions, Florida and Michigan, which had not recognized modifier units, did not receive significant complaints from anesthesiologists in teaching hospitals about the absence of modifier units. 55 Fed.Reg. at 32,082.

The Secretary rejected the ASA modifier proposal because she lacked the data to prove that the ASA proposal would be budget neutral or produce budget savings. Moreover, she was concerned that the ASA proposal, which attempted to maintain budget neutrality at the national level, would have distributional consequences across regions. The ASA proposal would increase payments to anesthesiologists in regions where carriers had not previously recognized modifiers, and it might decrease payments in areas that had previously recognized a more generous modifier policy. *Id.*

Plaintiffs are anesthesiologists with assigned claims and individual Medicare Part B participants with unassigned claims who provided or received anesthesia services between March 1, 1989 and December 31, 1991. (Am.Compl. ¶¶ 37, 40, 43–46.) One anesthesiologist also presented a claim for services provided after January 1, 1992. (Pls.' Opp'n Defs.' Cross Mot. at 8 & Addendum A.) In light of 42 C.F.R. § 405.553, Medicare carriers refused to reimburse plaintiffs for modifier units. (Am.Compl. ¶¶ 38, 41, 43–46.) Each of these decisions has been affirmed by an administrative law judge ("ALJ"). (*Id.* ¶¶ 39, 42–46.) The Department of Health and Human Services Appeals Council concluded that it does not have the authority to rule upon the validity of 42 C.F.R. § 405.553. (*Id.*, Ex. B at 1.) Effective January 1, 1992, 42 C.F.R. § 405.553 was repealed and replaced with a new provision, 42 C.F.R. § 414.46(b), which did not specifically mention modifier units. 56 Fed.Reg. 59,502

---

**3.** The language of the final rule was unchanged, in relevant part, from the language of the interim rule that had been in effect since March 1, 1989.

(1991).[4] Effective January 1, 1996, the Secretary amended section 414.46(b), specifically excluding modifier units. 60 Fed.Reg. 63,-124, 63,152 (1995).[5]

## Discussion

### I. Did the Secretary exceed her statutory authority when issuing 42 C.F.R. § 405.553?

■ Plaintiffs argue that the Secretary exceeded her statutory authority when she issued 42 C.F.R. § 405.553. They argue that the Secretary's decision to eliminate modifiers is inconsistent with the legislative history of section 4048(b). The Secretary argues that the language of section 4048(b) does not address the issue of modifiers and the legislative history is ambiguous.

■ The initial question when reviewing an agency's construction of a statute which it administers is whether Congress has spoken to the precise question at issue. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694, 702–03 (1984). In determining whether Congress has spoken, a court must look to the particular statutory language at issue, and must employ the traditional tools of statutory construction, including, where appropriate, legislative history. *Chemical Mfrs. Assn. v. EPA,* 919 F.2d 158, 162 (D.C.Cir.1990). If Congress has spoken on the particular issue, its expressed intent must be given effect. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82, 81 L.Ed.2d at 702–03. If, however, the statute is silent or ambiguous, the agency's interpretation will be deferred to if it is reasonable and consistent with the statute's purpose.

*Id.* at 844–45, 104 S.Ct. at 2782–83, 81 L.Ed.2d at 703–04. A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the agency. *Id.* at 844, 104 S.Ct. at 2782–83, 81 L.Ed.2d at 703; *see also Connecticut Dep't of Income Maintenance v. Heckler,* 471 U.S. 524, 532, 105 S.Ct. 2210, 2214–15, 85 L.Ed.2d 577, 584 (1985) ("agency's construction need not be the only reasonable one in order to gain judicial approval").

Section 4048(b) directs the Secretary to establish by January 1, 1989 a nation-wide uniform relative value guide that is budget neutral. The language of section 4048(b) is silent on the issue of whether modifier units should be included in the uniform relative value guide. Section 4048(d)(1) directs the General Accounting Office to conduct a study

(A) to determine the average anesthesia times reported for medicare reimbursement purposes,

(B) to verify those times from patient medical records,

(C) to compare anesthesia times to average surgical times, and

(D) to determine whether current payments for physician supervision of nurse anesthetists are excessive.

[GAO] shall report to Congress, by not later than January 1, 1989, on such study and in the report include recommendations regarding the appropriateness of the anesthesia times recognized by medicare for reimbursement purposes and recommendations regarding adjustment of payments for physician supervision of nurse anesthetists.

---

**4.** 42 C.F.R. § 414.46(b) (1995) formerly provided, in relevant part:

> (b) *General rules.*
> (1) For physician services furnished beginning January 1, 1992, HCFA bases payment on the lesser of the actual charge or the physician fee schedule amount in accordance with § 414.20.
> (2) The physician fee schedule amount is based on the product of allowable base and time units and an anesthesia-specific [conversion factor].

**5.** 42 C.F.R. § 414.46(b) (1996) currently provides, in relevant part:

> (b) *Determination of payment amount—Basic rule.* For anesthesia services performed, medically directed, or medically supervised by a physician, HCFA pays the lesser of the actual charge or the anesthesia fee schedule amount.
> (1) The physician fee schedule amount for an anesthesia service is based on the product of the allowable base and time units and an anesthesia specific [conversion factor]....
> (3) Modifier units are not allowed. Modifier units include additional units charged by a physician or a [certified registered nurse anesthetist] for patient health status, risk, age, or unusual circumstances.

101 Stat. at 1330–90. In the House Conference Report accompanying OBRA 1987, Congress specified that "[t]he GAO shall also examine the extent to which physicians bill and carriers recognize modifier units for reimbursement purposes and the appropriateness of such billings." H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. 603 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1245, 2313–1349.

Plaintiffs contend that it was the intent of Congress that the Secretary should not eliminate modifiers, if at all, until after the GAO had completed its report. Congress did not address this issue in either the language of section 4048(b) or its legislative history. Plaintiffs argue that the intent of Congress can be inferred from the legislative history, and that the Secretary rendered the congressionally mandated GAO study meaningless by eliminating modifiers before the GAO report was completed. It could not have been the intent of Congress, plaintiffs argue, that the GAO would conduct a meaningless study.

The GAO report did not become meaningless because the Secretary eliminated modifier units. The report was prepared for Congress, which could use the report to give further direction to the Secretary—perhaps even directing her to change her policy and recognize modifier units. The Secretary might also use the report to make further amendments to the uniform relative value guide.[6] At best, the legislative history shows that Congress wanted further study on the issue of modifier units.

Plaintiffs cite an April 26, 1988 memorandum from Kathleen A. Buto, Acting Director of the Bureau of Eligibility, Reimbursement and Coverage, as evidence that HCFA personnel knew that eliminating modifier units would violate section 4048(b). The relevant portion of the memo states:

[The GAO report] would also examine the extent to which physicians bill and carriers recognize modifier units for payment purposes and the appropriateness of such billings. This report is due to Congress not later than January 1, 1989. Based on the congressionally mandated studies, one could argue that Congress intended that the uniform relative value guide initially be designed to recognize base, time, and modifier units. Thus, it might be premature for HCFA to base a payment system solely on base units, one of the options proposed, without evidence that time and modifier units are being widely manipulated.

(Seymour Decl., Ex. CC at 2.) The Buto memo simply acknowledges one possible interpretation of section 4048(b). It does not preclude the Secretary's construction of the statute.

In as much as section 4048(b) is silent as to whether modifier units should be included in the uniform relative value guide, the Secretary's construction must be deferred to if it is reasonable and consistent with the purpose of the statute. The purpose of section 4048(b) was to establish a uniform relative value guide. Prior to March 1, 1989, thirty-five percent of Medicare carriers did not recognize modifier units and the remaining carriers recognized varying modifier unit policies. As the Secretary interpreted the statute, she had two options: (1) establish a uniform modifier unit policy for all carriers or (2) eliminate modifier units for all carriers. The Secretary's construction is reasonable and consistent with the purposes of section 4048(b) of OBRA 1987, and thus, the Secretary did not exceed her statutory authority when she issued 42 C.F.R. § 405.553.

II. *Was the Secretary's decision to eliminate modifier units arbitrary and capricious?*

■ Plaintiffs next argue that even if 42 C.F.R. § 405.553 is consistent with section

---

6. The GAO report was not issued until March 1991 and did not resolve the modifier issue in any event. It recommended that HCFA consider further the appropriateness of modifier units. The report found that the absence of a relationship between patient age or physical status and anesthesia time indicates that additional anesthesia payments for these patient characteristics are questionable. The GAO report also found that because carriers that had previously recognized modifier units increased their conversion factor to compensate for the elimination of the modifier units, this perpetuated the nationwide payment inequalities due to modifier units. GAO, Report No. HRD–91–23, Need for Consistent National Payment Policy for Special Anesthesia Services (1991), *reprinted in* 1991 Medicare and Medicaid Guide: New Developments (CCH) ¶ 39,124 (1991).

4048(b), the Secretary's decision to eliminate modifiers was arbitrary and capricious because the reasons given by the Secretary in support of the interim and final rules are not supported by the administrative record.

■ The scope of review under 5 U.S.C. § 706(2)(A) (1994) is "a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136, 153 (1971). In determining whether an agency has acted arbitrarily and capriciously, a court must determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443, 458 (1983) (internal quotation and citations omitted). An agency action may be set aside under this standard if the agency has relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.* A court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153.

The Secretary determined that the elimination of modifiers would not have a substantial adverse effect on individual anesthesiologists because: (1) thirty-five percent of Medicare carriers did not previously recognize modifier units; (2) modifier units were a relatively minor portion of the total number of relative value units; and (3) anesthesiologists typically treat a mix of patients with different health conditions. 55 Fed.Reg. at 32,079. Plaintiffs argue that there was overwhelming evidence in the administrative record that anesthesiologists who work in teaching hospitals or tertiary care centers or who specialize in cardiac anesthesia or who treat more complex cases would be significantly disadvantaged by the elimination of modifiers.

Several commentators argued that the patient mix at tertiary care or teaching hospitals was heavily weighted towards patients with modifier characteristics, and that anesthesiologists working at such institutions would be penalized by the elimination of modifiers. (*E.g.*, Admin.Rec. at 67, 268, 349, 564, 646.) However, there is little evidence in the administrative record that quantifies the financial impact of eliminating modifier units. One anesthesiologist estimated that the elimination of modifiers would reduce her income by twelve to fifteen percent. (*Id.* at 112.) Another anesthesiologist, fifty percent of whose patients were on Medicare, estimated that he would receive approximately $55 less for each unassigned case. (*Id.* at 107.) Another anesthesiologist, forty percent of whose patients were on Medicare, estimated that the "elimination of modifiers will cause a reduction in reimbursement of as much as 20-25% on many of my patients and a 5-10% reduction on most of the rest." (*Id.* at 117.)

Given the paucity of data on the subject, it was not arbitrary or capricious for the Secretary to conclude that there was no evidence "that anesthesiologists in teaching hospitals or those who specialize in certain cases will be disadvantaged *significantly* by the elimination of modifier units." 55 Fed.Reg. at 32,082 (emphasis added). The Secretary's conclusion was supported by comments from one anesthesiology society which indicated that elimination of modifiers would be balanced by the payment of time units because those factors that are the basis for modifier units are generally factors that contribute to the length of time required for the anesthesia service. (Admin.Rec. at 279.)

The Secretary also considered and rejected the ASA's modifier unit proposal because there was no conclusive data that the ASA proposal would be budget neutral as required by section 4048(b). The Secretary noted that it would be difficult to predict the number of modifier units that would be reimbursed under a new modifier unit policy. 55 Fed.Reg. at 32,082. Plaintiffs argue that the Secretary failed to consider an "obvious, common sense solution." They argue that the Secretary could have, based on the experience of carriers who had previously recognized modifiers,

predicted the number of modifier units for the thirty-five percent of carriers that had not previously recognized modifiers. (Seymour Decl. ¶ 17.) Plaintiffs' after-the-fact recommendation does not provide conclusive data that the ASA proposal would have been budget neutral.

Even if the ASA proposal could have been implemented in a budget neutral fashion, the Secretary was concerned that the ASA proposal, which was designed to maintain budget neutrality at the national level, would have undesirable distributional consequences. The ASA proposal would increase payments to anesthesiologists in regions where carriers had not previously recognized modifiers, and it might decrease payments in areas that had previously recognized a more generous modifier policy. 55 Fed.Reg. at 32,082. Plaintiffs do not challenge the Secretary's judgment in this regard.

Finally, the Secretary was concerned that establishing a national uniform modifier unit policy might set a precedent for other physician specialties. 55 Fed.Reg. at 32,079. Plaintiffs argue that the Secretary's purported fear of an unfavorable precedent is implausible because sixty-five percent of Medicare carriers had recognized modifier units since at least 1969, and modifier units have not spread to other disciplines where they are not medically appropriate. (Pls.' Mem. Supp.Summ.J. at 34.) The Secretary's judgment on this issue is hardly implausible. If the Secretary were to establish a national uniform modifier unit policy, it might encourage other disciplines to advocate a similar reimbursement policy. The Secretary is best equipped to evaluate this threat.

Because the Secretary considered the relevant factors and because there was no clear error of judgment, the decision to eliminate modifier units was not arbitrary or capricious.

III. *Did the Secretary follow appropriate procedures when issuing 42 C.F.R. § 405.553?*

Plaintiffs claim that the Secretary did not follow appropriate procedures when issuing 42 C.F.R. § 405.553. Plaintiffs argue that the Secretary did not consult with the ASA

as required by OBRA 1987, that she unlawfully shortened the period for public comment, and that she failed to consider the comments she received from interested persons. Plaintiffs' arguments are not persuasive.

A. Consultation with the ASA

Section 4048(b) provides that the Secretary "in consultation with groups representing physicians who furnish anesthesia services, shall establish by regulation a relative value guide for use in all carrier localities." HCFA officials met twice with representatives from the ASA before the Secretary issued the notice of the proposed interim rule in January of 1989. The ASA responded to the concerns expressed by HCFA officials at these meetings and amended its modifier proposal. Both the notice of the proposed interim rule and the notice of the final rule discussed the amended ASA proposal.

Plaintiffs cite four internal agency documents as evidence that HCFA officials had already decided to eliminate modifier units before they met with the ASA. Therefore, plaintiffs argue, HCFA's meetings with the ASA were empty gestures and the Secretary failed to give good faith consideration to the ASA's views.

Three documents cited by plaintiffs discuss staff recommendations regarding the uniform relative value guide. On March 15, 1988, Bernard J. Patashnik, a HCFA official, prepared a memorandum regarding the development of a uniform relative value guide for anesthesia services. (Seymour Decl., Ex. AA.) It included a proposed methodology for computing budget neutral conversion factors that assumed that modifier units would not be part of the uniform relative value guide. (*Id.*, Ex. AA at 1.) The Patashnik memorandum noted, however, that "[n]o decisions have yet been made on the [relative value guide] that will be the basis for the uniform [relative value guide]." (*Id.*) On April 11, 1988, Charles R. Booth, another HCFA official, circulated a memorandum to HCFA staff regarding regulation specifications to implement section 4048(b). (*Id.*, Ex.

BB.) The Booth memorandum recommended a uniform relative value guide that did not include modifier units. (*Id.*, Ex. BB at 3.) Later that month, Kathleen Buto, Acting Director of the Bureau of Eligibility, Reimbursement and Coverage, sent a memorandum to C. Ross Anthony, Associate Administrator for Program Development, discussing the pros and cons of various modifier unit policies. (*Id.*, Ex. CC.) Buto recommended eliminating modifier units, but noted that the regulation specifications would be amended if Anthony decided to change the recommendation. (*Id.*, Ex. CC at 5.)

HCFA officials met with representatives of the ASA in June and August 1988. After the August meeting, Booth sent a memorandum to Anthony and Buto summarizing the meeting and alerting them to the concerns voiced by the ASA. (*Id.*, Ex. EE.) Patashnik told the ASA at this meeting that he was personally opposed to modifiers for various reasons, but that "until it goes through the review process, the issue was still alive." (*Id.*, Ex. EE at 2.)

The documents from March and April of 1988 indicate that HCFA officials had developed proposals for a uniform relative value guide prior to meeting with the ASA. However, plaintiffs have not presented any evidence that the Secretary did not give full and careful consideration to the ASA proposal. HCFA officials met with representatives of the ASA twice before the Secretary issued the notice of the proposed interim rule in January 1989. The purpose of the Booth memo in August of 1988 was "to alert [Anthony and Buto] to ASA's concerns." (*Id.*, Ex. EE at 1.) In the notices that accompanied both the interim rule and the final rule, the Secretary addressed the concerns raised by the ASA and the ASA proposal. Section 4048(b) requires the Secretary to establish a uniform relative value guide in *consultation* with the ASA. Section 4048(b) does not require the Secretary to hold all regulatory activity in abeyance until her staff has met with the ASA. The Secretary met her obligations under section 4048(b).

### B. Period for public comment

Plaintiffs assert that the period for public comment should have been sixty days, rather than thirty days. 42 U.S.C. § 1395hh(b) (1994) provides:

(1) Except as provided in paragraph (2), before issuing in final form any regulation . . ., the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon.

(2) Paragraph (1) shall not apply where—(A) a statute specifically permits a regulation to be issued in interim final form or otherwise with a shorter period for public comment. . . .

Section 4039(g) of OBRA 1987 provides that the Secretary "shall issue such regulations (on an interim or other basis) as may be necessary" to implement OBRA 1987. 101 Stat. at 1330–83. Plaintiffs argue that it is irrelevant that Congress authorized the Secretary to issue interim regulations. It is plaintiffs' position that section 1395hh(b)(2)(A) takes effect only when Congress explicitly authorizes a shorter period for public comment. The Secretary interprets section 1395hh(b)(2)(A) to mean that the requirements of section 1395hh(b)(1) do not apply when Congress either authorizes her to issue interim regulations or provides for a shorter period for public comment.

*Housing Study Group v. Kemp*, 736 F.Supp. 321, 334–35 (D.D.C.1990), cited by plaintiffs, did not address this issue. In *Housing Study*, the Department of Housing and Urban Development ("HUD") issued an interim rule with a thirty-day period for public comment. The issue was whether HUD had demonstrated "good cause" as required by 5 U.S.C. § 553(b) (1994) in order to dispense with the full sixty-day comment period otherwise required by HUD regulations. HUD did not argue that its authority to issue interim rules also gave it the authority to shorten the period for public comment.

The problem with plaintiffs' argument is that it would eliminate the distinction between interim regulations and other types of regulations. Based on the language of section 1395hh(b)(2)(A), that was not the intent of Congress. Section 1395hh(b)(2)(A) provides that the requirements of section

1395hh(b)(1) do not apply where a statute "permits a regulation to be issued in interim final form *or* otherwise with a shorter period for public comment" (emphasis added). Under plaintiffs' interpretation, the words "in interim final form or otherwise" would be rendered meaningless. If Congress meant to limit section 1395hh(b)(2)(A) to those situations where a statute permits a regulation to be issued with a shorter period for public comment, Congress could have so provided. That Congress did not do so indicates that Congress intended to treat interim regulations as a separate category from those regulations where Congress permits a shorter period for public comment.

Moreover, to accept plaintiffs' interpretation would render the language of section 1395hh(b)(2)(A) unnecessary. When a statute specifically permits a shorter period for public comment, there is no need to refer to section 1395hh(b)(2)(A). In such circumstances, section 1395hh(b)(2)(A) simply repeats what Congress has already provided for in another statute. A more reasonable interpretation of section 1395hh(b)(2)(A) is that when Congress authorizes the Secretary to issue interim regulations, section 1395hh(b)(1) does not apply and the Secretary has the discretion to determine the length of the period for public comment consistent with the requirements of the Administrative Procedure Act. Because Congress authorized the Secretary to issue interim regulations to implement OBRA 1987, the Secretary was not required to provide sixty days for public comment when issuing 42 C.F.R. § 405.553.

**C. Consideration of comments from interested persons**

 Finally, plaintiffs argue that the Secretary violated the Administrative Procedure Act because she prejudged the modifier issue and closed her mind to the comments received in response to the notice of the proposed interim rule. 5 U.S.C. § 553(c) (1994) provides:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data,

views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

The notice of the proposed interim rule issued in January 1989 gave interested persons thirty days to submit comments. The Secretary responded to the voluminous comments in the notice of the final rule.

Plaintiffs claim that the "[Secretary's] mind was unalterably closed, that [she] set [her] mind on eliminating modifiers and that [she] never intended to consider any contrary views." (Pls.' Mem.Supp.Summ.J. at 8.) Plaintiffs argue that the Secretary's failure to keep an open mind before receiving public comment violates section 553(c). The evidence indicates that the Secretary gave appropriate consideration to the comments she received. Even assuming that the Secretary "had set her mind on eliminating modifiers," plaintiffs have not presented any authority that it is the role of the courts to police the mindset of the Secretary if she otherwise follows appropriate rulemaking procedures.

Plaintiffs cite *Reeder v. Federal Communications Comm'n*, 865 F.2d 1298 (D.C.Cir. 1989), and *Air Transport Ass'n of America v. Department of Transp.*, 900 F.2d 369 (D.C.Cir.1990), *remanded*, 498 U.S. 1077, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991), *vacated as moot*, 933 F.2d 1043 (D.C.Cir.1991), *overruled on other grounds by JEM Broadcasting Co. v. Federal Communications Comm'n*, 22 F.3d 320, 328 (D.C.Cir.1994), for the proposition that an agency cannot prejudge an issue before interested persons have an opportunity to comment. However, both of those cases involved situations where the agency issued final rules without any notice or period for public comment. In *Reeder*, the court found that the agency had no justification for completely ignoring notice and comment procedures. 865 F.2d at 1304–05. In *Air Transport*, the court held that the agency's response to comments submitted after the final rules became effective did not cure the agency's failure to provide notice and a period for public comment before the final rules became effective. 900 F.2d at

379–80. By contrast, in this case, the Secretary provided notice and thirty days for public comment before the final rule became effective in September of 1990. In the notice of the final rule, the Secretary issued a statement regarding the basis and purpose of the regulation and responded to comments from the public. Thus, the Secretary satisfied the requirements of section 5 U.S.C. § 553. *See Sullivan v. Farmers Home Admin.*, 691 F.Supp. 927 (E.D.N.C.1987) (agency issued final regulations after considering comments received during comment period provided for in interim regulations).

In sum, plaintiffs have not demonstrated that the Secretary exceeded her statutory authority, acted arbitrarily or capriciously, or that the Secretary violated any procedural requirement imposed by OBRA 1987, the Medicare Act, or the Administrative Procedure Act.

## IV. *Post–1991 Claims*

■ Effective January 1, 1992, 42 C.F.R. § 405.553 was repealed and replaced with 42 C.F.R. § 414.46(b), which did not explicitly mention modifier units. Effective January 1, 1996, the Secretary amended § 414.46, specifically excluding modifier units. Plaintiffs argue that modifiers must be paid for the post–1991 period pursuant to 42 C.F.R. § 405.506, which authorizes payment in certain "unusual circumstances." [7] Plaintiffs cite a recent ALJ decision which held that, in light of the repeal of 42 C.F.R. § 405.553, administration of anesthesia to a patient over the age of seventy or with below-normal physical status automatically qualifies as an "unusual circumstance" within the meaning of 42 C.F.R. § 405.506, and should be reimbursed in accordance with the ASA's modifier unit policy. (Am.Compl., Ex. J at 17.)

■ The Secretary argues that the court lacks jurisdiction over claims for the post–1991 period because plaintiffs have not exhausted their administrative remedies. Under 42 U.S.C. § 405(g) (1994), a federal court may review a Medicare determination where a claimant has obtained a final agency decision. Denial of relief by the Appeals Council is a final decision of the Secretary, which may be appealed to a district court. *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir.1996). Only one of the ninety-six named plaintiffs submitted a claim for anesthesia services provided after January 1, 1992. This claim was denied at the ALJ level and an appeal is pending before the Department of Health and Human Services Appeals Council. (Pls.' Opp'n Defs.' Cross Mot. at 8 & Addendum A.[8]) The Appeals Council has also assumed jurisdiction over ALJ decisions which held that modifier units should be reimbursed for post–1991 claims on the basis of 42 C.F.R. § 405.506. (*Id.* at 9.) Therefore, plaintiffs' post–1991 claims can proceed only if it is proper to waive the exhaustion requirement. *Pavano*, 95 F.3d at 150.

■ As the Second Circuit has noted, "[e]xhaustion is the rule, waiver the exception." *Abbey v. Sullivan*, 978 F.2d 37, 44 (2d Cir.1992). "Parties are generally required to exhaust their administrative remedies, in part because of concerns for separation of powers (i.e., the need to limit judicial interference in the agency process) and the need to conserve judicial resources." *Pavano*, 95 F.3d at 150. The criteria governing judicial waiver of the exhaustion requirement are: (1) whether the claim is collateral to a demand for benefits; (2) whether exhaustion would be futile; and (3) whether the plaintiffs would suffer irreparable harm if required to exhaust their administrative remedies. *Abbey*, 978 F.2d at 44. "Of course, these factors cannot be applied mechanically. Rather their application must be guided by the policies underlying the exhaustion requirement. Each decision essentially involves a judgment that weighs the utility of

---

7. 42 C.F.R. § 405.506 (1995) provides, in relevant part:
 A charge which exceeds the customary charge of the physician . . . or the prevailing charge in the locality, . . . may be found to be reasonable, but only where there are unusual circumstances, or medical complications requiring additional time, effort or expense which support an additional charge, and only if it is acceptable medical or medical service practice in the locality to make an extra charge in such cases.

8. The ALJ did not consider the repeal of 42 C.F.R. § 405.553.

exhaustion against countervailing considerations like futility and irreparable harm." *Id.* (internal quotations and citations omitted).

Plaintiffs do not argue that their claims are collateral to a demand for benefits or that they will suffer irreparable harm. Plaintiffs argue that exhaustion would be futile. According to plaintiffs, if the Appeals Council affirms the award of modifier units or remands to an ALJ who then awards modifier units, the result will be an impermissible bifurcated administrative process in which only those who pursue an administrative appeal will be reimbursed for modifier units.

Plaintiffs argue that this case is analogous to *Jones v. Califano,* 576 F.2d 12 (2d Cir. 1978). Plaintiffs are incorrect. The plaintiffs in *Jones* challenged the Secretary's method of calculating retroactive disability benefits. The Appeals Council had ruled on four occasions that the Secretary's method of calculation was incorrect. Nevertheless, the Secretary refused to change the calculation method. Thus, only those who requested a hearing received their full benefits, while those who failed to request a hearing did not. The Second Circuit found that this was "unequal justice," which raised "colorable questions of equal protection and due process." *Id.* at 18. The Second Circuit held:

> When the administrative process becomes bifurcated, as when independent administrative judges interpret statutes in adjudicated cases that may not technically bind the Secretary, care must be taken lest certain needy beneficiaries, because of the limitations of poverty or ignorance, fail to receive the full amount of benefits to which they are entitled. Thus, we find it appropriate to imply a waiver of the exhaustion requirement when, as in this case, there is a stalemate defying judicial review.

*Id.* at 20. The court in *Jones* limited its holding to the particular combination of circumstances presented in that case, including, *inter alia:* the Secretary's clear error in calculating the plaintiffs' retroactive benefits; the evasion of judicial review; and the colorable due process and equal protection claims. *Id.* at 21.

This is not a case where the Secretary is refusing to follow the rulings of the Appeals Council. Indeed, the Appeals Council has not ruled on any post–1991 claims. Plaintiffs have not presented any evidence that the Secretary will refuse to reimburse modifier units if the Appeals Council determines that reimbursement is appropriate for the post–1991 period. Nor has the Appeals Council attempted to avoid judicial review by remanding claims to ALJs rather than deciding the issue itself. Thus, *Jones* is not applicable. And plaintiffs may not rely on the district court's decision in *Pavano v. Shalala,* No. 94 Civ. 0359 (JSM), 1995 WL 296732 (S.D.N.Y. May 16, 1995), since it has been vacated in relevant part by the Second Circuit, 95 F.3d at 150. Plaintiffs have not demonstrated that exhaustion would be futile or should otherwise be waived. Therefore, the post–1991 claims are dismissed for lack of subject matter jurisdiction.

### *Conclusion*

For the foregoing reasons, plaintiffs' motion for summary judgment and class certification is denied and defendants' motion for judgment on the pleadings is granted.

SO ORDERED.