### WASHINGTON GAS ENERGY SERVICES, INC., Petitioner,

v.

### DISTRICT OF COLUMBIA PUBLIC SERVICE COMMISSION, Respondent.

### Pepco Energy Services, Inc., Petitioner,

v.

### District of Columbia Public Service Commission, Respondent.

No. 05–AA–155, 05–AA–315, 05–AA–157, 05–AA–426.

District of Columbia Court of Appeals.

Argued Dec. 16, 2005.

Decided March 9, 2006.

Karen B. Pancost, with whom Telemac N. Chryssikos was on the brief, Washington, for Washington Gas Energy Services.

Peter E. Meier, with whom Carla G. Pettus and Nicholas S. Penn were on the brief, Washington, for Pepco Energy Services.

Marc J. Williams, with whom Richard Beverly, General Counsel, was on the brief, for respondent.

Before SCHWELB, REID and FISHER, Associate Judges.

FISHER, Associate Judge:

This is a case about administrative rulemaking. D.C.Code § 34–912(b)(1) (2001 ed.) allows the Public Service Commission (PSC) to issue assessments to public utilities, electricity suppliers, and others in order to recover the amount of its own budget and that of the Office of People's Counsel (OPC). In these petitions consolidated for review, Washington Gas Energy Services, Inc. (WGES) and Pepco Energy Services, Inc. (PES) challenge the fiscal year (FY) 2003 and FY 2004 assessments imposed on them by the PSC. We conclude

the PSC committed fatal procedural errors in promulgating the formula through which the assessments were made. Given the prohibition against engaging in retroactive rulemaking without express legislative authority, it is now too late to repair the damage for those two fiscal years. We do not reach petitioners' substantive challenges to the PSC's formula.[1]

## I. Factual Background

Prior to 2000, the electricity market in the District was monopolistically held by Pepco, which was responsible for generating, transmitting, and delivering electricity. Pepco was directly regulated by the PSC, as were the other public utilities in the city. In December of 1999, the Council of the District of Columbia passed the "Retail Electric Competition and Consumer Protection Act of 1999," effectively deregulating the retail supply of electricity in the District. D.C. Law 13–107, 47 D.C.Reg. 1091 (May 9, 2000), codified at D.C.Code § 34–1501 et seq. Electricity deregulation created new entities called "electricity suppliers." These "electricity suppliers" are distinct from "electric companies," which are still considered public utilities.[2]

Under the old regulatory scheme, the public utilities were required to reimburse the District for the budgets of the PSC and the OPC by paying assessments levied on them by the PSC. D.C.Code § 43–612(b)(1) (1999 Supp.) (recodified in 2001 ed. as D.C.Code § 34–912(b)(1)). In order to accurately assess the public utilities, PSC established a revenue-based formula through rulemaking. 15 DCMR § 1300.1 et seq. (1999 Supp.). The term "public utilities" from the pre–2000 regulatory scheme included electric companies. D.C.Code § 43–203 (1999 Supp.).

As part of deregulation, the Council amended § 34–912(b) to permit the PSC to assess electricity suppliers, as well as public utilities and telecommunications providers, in order to recover the PSC and OPC budgets. D.C.Code § 34–912(b)(1). Specifically, the PSC was granted authority to assess each electricity supplier annually based on a formula that "shall be determined by the Public Service Commission." D.C.Code § 34–912(b)(2) (2001 ed.). During the events at issue here, § 34–912 read, in relevant part, as follows:

(b)(1) All amounts appropriated for the Public Service Commission and the Office of People's Counsel for each fiscal year ... shall be repaid during such

---

1. In January of 2005, the PSC essentially started the rulemaking process anew by publishing notice in the D.C. Register that it was undertaking a rulemaking to establish a formula for assessments of electricity suppliers. 52 D.C.Reg. 584 (Jan. 21, 2005). Following the deregulation of gas suppliers in early 2005, the PSC amended its proposed rule in May of 2005 to include gas suppliers. 52 D.C.Reg. 4618 (May 13, 2005). That rulemaking process has not been completed, and, in light of our disposition of these cases, any substantive comments we would offer now would amount to an advisory opinion.

2. The PSC made this distinction itself when it recognized that

[i]n order for an electricity supplier to be a public utility under our rules, it must be a public utility within the meaning of D.C.Code § 34–214. According to D.C.Code § 34–214, the term public utility includes electric corporations. However, pursuant to D.C.Code § 34–207, the term electric corporation includes only companies physically transmitting or distributing electricity in the District of Columbia to retail customers. Because the Potomac Electric Power Company retains control over the transmission and distribution systems in the District, PES and WGES are not physically transmitting or distributing electricity. Therefore, they are not public utilities ....

Order No. 13062, ¶ 8 (Feb. 6, 2004).

fiscal year by the electricity suppliers and telecommunications services providers as a reimbursement fee.[3]

(2) The amount of the reimbursement fee to be paid by each electricity supplier and local exchange carrier ... authorized to provide service in the District, and the formula through which such an amount shall be annually established, shall be determined by the Public Service Commission.

WGES and PES entered the District's electricity market on January 2, 2001, and February 1, 2001, respectively. Apparently, no effort was made to assess them for a portion of the PSC or OPC budgets for FY 2001 or FY 2002.

On August 22, 2003, toward the end of fiscal year 2003, the PSC issued orders assessing both petitioners for what the PSC claimed were their portions of the FY 2003 budgets of the PSC and OPC.[4] The PSC did not explain how it had calculated the amounts in the assessments—it simply sent them a bill. Both petitioners promptly filed an application for reconsideration.

On February 6, 2004, the PSC issued Order No. 13062, which granted the applications for reconsideration and vacated the August 22, 2003, assessments. The PSC also acknowledged that the formula used to calculate the electricity suppliers' assessments as contemplated by D.C.Code § 34–912(b)(2) was a "rule" within the meaning of the District of Columbia Administrative Procedure Act (DCAPA). *See* D.C.Code § 2–505(a) (defining "rule") (2001 ed.). The PSC further admitted that petitioners were not "public utilities" covered by the Commission's then-existing assessment regulations. 15 DCMR § 1300.1 *et seq.* See note 2 *supra.*

Six months later, on August 5, 2004, the PSC issued a "Notice of *Proposed* Assessment" to each petitioner (emphasis supplied). In these two notices, the PSC proposed that WGES and PES pay the same amounts for FY 2003 as reflected in the August 22, 2003, orders. The PSC used the notices to explain what formula it would use to calculate the assessments, to give its reasons for using that formula, and to give the petitioners thirty days to file

**3.** The careful reader will notice that the term "public utilities" does not appear in the current version of § 34–912(b)(1). However, the pre–2000 version of § 34–912(b)(1) clearly included "public utilities" in the assessment scheme. It appears that a clerical or scrivener's error has occurred in amending the statute. *See Gilmore v. United States,* 699 A.2d 1130, 1132 (D.C.1997) ("Under well-established case law, this court has the power to correct [the clerical] error and give effect to the legislature's obvious intent ...." (citing *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 462, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993)); *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (en banc) ("[A] court may refuse to adhere strictly to the plain wording of a statute in order 'to effectuate the legislative purpose ....' " (citation omitted)). The legislative history of the deregulation act explains that § 34–912(b)(1) is being amended by *"inserting* the phrase [and punctuation] ', electricity suppliers' *after* the phrase 'public utilities." ' Comm. Rep. on D.C. Law 13–107 at 98 (emphasis added). If this had been done, the sentence would read that the budget "shall be repaid during [each] fiscal year by the *public utilities, electricity suppliers* and telecommunications services providers." This appears to be the language the legislature intended.

In these cases, this issue is more academic than real. Neither the petitioners nor the PSC argue that public utilities should be excused from paying a portion of the budgets of the PSC and the OPC.

**4.** The PSC determined that WGES owed $569,710.84 for its portion of the PSC budget and $360,795.82 for its portion of the OPC budget, for a total assessment of $930,506.66. The PSC further determined that PES owed $468,080.17 for its share of the PSC budget and $296,433.49 for its share of the OPC budget, for a total assessment of $764,513.66.

comments. The formula the PSC proposed using was the same revenue-based formula it had devised to assess all public utilities in the pre–2000 regulatory scheme.[5]

Although both petitioners objected to that formula and the FY 2003 assessments, the PSC soon thereafter issued assessments for FY 2004 on September 17, 2004.[6] Those FY 2004 assessments used the same formula outlined in the FY 2003 assessments proposed on August 5. Petitioners promptly objected to the FY 2004 assessments and formula. On January 7, 2005, the PSC rejected petitioners' objections to the FY 2003 and FY 2004 assessments. On that day, it finalized the reimbursement fee and the methodology used to derive that fee and ordered the petitioners to pay both the FY 2003 and FY 2004 fees. Both petitioners did so, under protest, and filed the instant petitions for review.

## II. Discussion

The petitioners' arguments fall into two main categories—procedural and substantive. First, they assert that the PSC did not follow the procedural requirements of the DCAPA and that the "rule"—the formula under which they were assessed—is therefore a nullity. Specifically, they allege that the PSC did not give adequate notice to affected parties, and that the PSC adopted an impermissibly retroactive rule when it assessed the two companies.

Their second argument is that the formula itself is arbitrary and capricious and violates the PSC's statutory grant of authority. We agree that the PSC violated the procedural requirements of the DCAPA and do not reach the substantive questions.

### A. Standard of Review

Appeals to this Court from Public Service Commission orders are governed by D.C.Code § 34–606 (2001 ed.), which provides that

[i]n the determination of any appeal from an order or decision of the Commission the review by [this] Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious.

Our review of the substance of the PSC's decisions, therefore, is "the narrowest judicial review in the field of administrative law." *Office of People's Counsel v. Public Serv. Comm'n,* 610 A.2d 240, 243 (D.C. 1992) (internal citation and quotation omitted).

We owe no such deference to the PSC with respect to its compliance with the DCAPA. It is a matter of settled law that the Commission is subject to the procedural requirements of the DCAPA. *Chesapeake & Potomac Tel. Co. v. Public*

---

**5.** To determine each utility's share of the reimbursement for its own budget and that of the OPC, PSC had promulgated regulation 15 DCMR § 1301.1, which states:

Each public utility shall be assessed a fraction of the reimbursable budgets of the Commission and of People's Counsel equal to the ratio of that utility's calendar year gross revenues to the sum of the calendar year gross revenues of all public utilities. Calendar year gross revenues are those revenues earned during the preceding calendar

year by each public utility from utility operations in the District that are regulated by the Commission.

**6.** For 2004, the PSC assessed WGES $415,905.24 for the OPC budget and $650,142.17 for the PSC budget, for a total assessment of $1,066,047.41. The PSC also determined that PES owed $242,845.72 for the OPC budget and $379,615.90 for the PSC budget, for a total assessment of $622,461.62.

*Serv. Comm'n,* 339 A.2d 710, 712–13 (D.C. 1975). When it enacted the DCAPA, Congress explicitly allowed this court "[t]o hold unlawful and set aside any action [embodied in an administrative order] ... found to be ... [w]ithout observance of procedure required by law, including any applicable procedure provided by [the DCAPA]." D.C.Code § 2–510(a)(3)(D). *See also Abadie v. District of Columbia Contract App. Bd.,* 843 A.2d 738, 741 (D.C. 2004) (indicating that *de novo* standard of review applies to interpretation of the DCAPA and other statutes).

### B. *Adequacy of Notice*

■ The DCAPA requires that "each independent agency shall, prior to the adoption of any rule ..., publish [the proposed rule] in the District of Columbia Register (unless all persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law) ...." D.C.Code § 2–505(a) (2001 ed.).[7] Using this "actual notice" exception to avoid publication of a proposed rule has not, until now, been the subject of published opinions in the District of Columbia. Even in federal rulemaking, "[t]his exception is ... rarely used ...." James T. O'Reilly, Administrative Rulemaking: Structuring, Opposing, And Defending Federal Agency Regulations § 3.09 at 60 (1983).

The PSC admits that prior to January 2005 it did not publish the proposed formula in the D.C. Register, instead sending the proposed assessments to WGES and PES individually. The PSC nevertheless argues that "[b]ecause the public is not subject to the rule, notice of the rulemaking is not required. As for suppliers, the only two in the market at the time were Petitioners." Petitioners argue, conversely, that many others are "subject" to the proposed regulation in addition to themselves. They submit that inactive electricity suppliers or "as-yet unidentified potential market entrants are implicated" to the extent they would decide to enter (or refrain from entering) the market based upon the costs imposed through this formula;[8] members of the public would be affected as the assessment may be passed through to them in the rates that electricity suppliers charge; and public utilities would be affected by the formula because every dollar paid by the electricity suppliers is a dollar that will not need to be paid by the public utilities.

■ To resolve the issue of notice, we must decide what "subject thereto" means in § 2–205. In light of the purposes served by requiring notice and allowing comment on a proposed rule, the reach of

---

7. The DCAPA goes on to define a rule as "the whole or any part of ... [an] agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy ...." D.C.Code § 2–502(6) (2001 ed.). Nobody in this litigation argues that the proposed formula is not a rule. In its order revoking the first set of FY 2003 assessments, the PSC conceded that the proposed formula was a rule and that it, therefore, needed to follow the DCAPA.

8. The record does not tell us the precise number of electricity suppliers in existence at the time the August 2004 rule was proposed. The

PSC's website lists twenty-four approved electric generation and transmission suppliers, nine of whom are currently providing service. *See* http://www. dcpsc.org/customer-choice/whatis/electric/electric_providers.shtm (last visited March 7, 2006). During oral argument, PES was asked how many market participants existed at the time of the August 2004 rulemaking. PES estimated the number to be "at least a half dozen" and "approximately 16 other electricity suppliers." Each of these entities might have had an interest in commenting on a proposed rule that would influence their cost of doing business.

this language cannot be limited to the entities that are the direct targets of the proposed regulations. We hold that a party is "subject thereto" when it is "affected by" the proposed rule. *See* O'REILLY, *supra,* § 3.09 at 59–60 (commenting that the corresponding provision in the federal APA excuses an agency from publication "if all of the *affected persons* are named" and served (emphasis added)). *See also Sprint Corp. v. FCC*, 354 U.S.App. D.C. 288, 292, 315 F.3d 369, 373 (2003) ("[T]he notice requirement [of § 553(b) of the federal APA] ... ensures fairness to affected parties ....") (internal quotation and citation omitted); *United States v. An Article of Drug*, 540 F.Supp. 363, 372 (N.D.Tex.1982) (finding that because "all of the entities *affected by* the new interpretation were put on notice," the exception for actual notice to "persons subject thereto" had been satisfied (emphasis supplied)). This is necessarily an imprecise test, but an independent agency easily can avoid the issue by publishing notice of its proposed rulemaking. *See* O'REILLY, *supra,* § 3.09 at 60 ("In a typical rulemaking, so many people could be affected that general notice is needed and is given.")

■ As we will explain, what at first blush appears to be merely a procedural issue of giving proper notice does, in fact, have a significant impact in this case. We thus are persuaded that others who did not receive actual notice were "subject" to or "affected by" the proposed rule. The PSC should have followed normal procedures and published notice of the proposed rule in the D.C. Register. Because it did not do so, the formula it adopted for assessing electricity suppliers is invalid. *See Webb v. District of Columbia Dep't of Human Servs.*, 618 A.2d 148, 151 (D.C.1992)

(regulations not promulgated in compliance with the DCAPA were invalid).

The assessment provision exists to require the PSC and the OPC to recover, from the industries they serve, an amount equal to their operating budgets. At the time of these attempts at assessment, the budgets were to be recovered from three groups: public utilities, electricity suppliers, and telecommunications services providers. Every dollar collected from the members of one group would be a dollar that members of the other groups did not have to pay. In these appeals, for example, petitioners argue they should be assessed at a substantially reduced rate since they are members of a deregulated industry, and the PSC and the OPC presumably spend fewer resources overseeing them than they devote to the regulated utilities. If the petitioners were to be assessed at a lower rate, as they suggest, this would increase the percentage of the PSC and the OPC budgets that the public utilities would be required to reimburse. If a formula of this nature had been proposed, there is little doubt that the public utilities would have protested loudly (had they been afforded the opportunity to do so).

Because the reimbursement scheme is a zero-sum game,[9] the public utilities and telecommunications services providers are "subject" to and "affected by" the formula under which petitioners are assessed. (After further deregulation in early 2005, gas suppliers now are also subject to assessment. See note 1 *supra.*) Thus, it is not sufficient that only the petitioners had actual notice of the proposed rule.

## C. *Standing*

■ With little elaboration, the PSC questions whether the petitioners, who did

---

9. *See* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 2076 (3rd ed.1992) (defining "zero-sum game" as "[a] situation in which a gain by one person or side must be matched by a loss by another person or side").

have actual notice of the proposed rule, can complain that other parties did not have notice. However, we have held in analogous circumstances that a petitioner with actual notice does have standing to raise a deficiency in notice to others. *Dupont Circle Citizens Ass'n v. District of Columbia BZA,* 403 A.2d 314, 318–19 (D.C. 1979) [hereinafter *Dupont Circle II*]. In *Dupont Circle II* this court confronted two competing lines of cases. We had held in *Dupont Circle Citizens Ass'n v. District of Columbia BZA,* a case with a similar caption but no factual relationship, that those with actual notice did not have standing to challenge a deficiency in providing notice. 364 A.2d 610 (D.C.1976). Only a year later in *Kopff v. District of Columbia ABC Bd.,* we held that those with actual notice did have standing to question the sufficiency of notice to others. 381 A.2d 1372 (D.C. 1977). In *Dupont Circle II,* we resolved the conflict by holding that

> [w]hile injury in fact is generally required for standing, the very purpose of the notice provisions obviate[s] the need for this requirement for standing to challenge compliance with notice specifications. One without notice is rarely in a position to complain of his ignorance, being unaware of the ignorance. As a matter of practical necessity, one with actual notice must be endowed with the power to compel compliance. An agency could otherwise largely disregard its notice regulations during the hearing proceedings, knowing that it may avoid ju-

dicial review by asserting the lack of standing of the opponents of its action. 403 A.2d at 318.[10]

*Dupont Circle II* and *Kopff* involved violations of agency regulations rather than the notice-by-publication provision of the DCAPA. Nevertheless, all of these notice provisions serve the same purpose—to give parties that may be affected by agency action an opportunity to comment. *Chocolate Mfrs. Assoc. v. USDA,* 755 F.2d 1098, 1103 (4th Cir.1985) (requiring an agency to keep an open mind and only adopt a policy after it has received comments from interested and affected parties). The sound reasoning of *Dupont Circle II* is equally applicable here. We therefore hold that the petitioners may complain that this rulemaking proceeding is invalid due to lack of notice to other affected parties.

■ By considering these complaints about lack of proper notice, we are not merely granting petitioners third-party standing. In these circumstances it is likely that the lack of notice to others has caused petitioners actual harm. The very purpose of rulemaking is for an agency to consider plausible options and only adopt a proposal after a comment period. *See Chocolate Mfrs. Assoc.,* 755 F.2d at 1103. Instead of approaching its rulemaking with an open mind, however, the PSC apparently decided that it would simply extend the old rule to these new entities. *See McLouth Steel Prods. Corp. v. EPA,* 267 U.S.App. D.C. 367, 375, 838 F.2d 1317, 1325 (1988) ("[A]dequate notice and oppor-

---

10. In *M.A.P. v. Ryan,* 285 A.2d 310 (D.C. 1971), this court held that "[a]s a matter of internal policy, ... no division of this court will overrule a prior decision of this court ... and that such [a] result can only be accomplished by this court en banc." *Id.* at 312. The *Dupont Circle II* court, although only a division, was able to resolve the conflict in its decisions without a formal en banc hearing.

It circulated the proposed opinion to all members of the court. No member of the court objected to the holding and supporting reasoning in *Dupont Circle II,* and none requested formal en banc consideration. *Dupont Circle II,* therefore, "effectively overturns the [conflicting] holding." *Dupont Circle II,* 403 A.2d at 318.

tunity to comment must be provided *before* promulgation of a rule, not later.". (emphasis in original)). The PSC may have assumed that the public utilities would not object to doing things the old-fashioned way. By taking this shortcut, however, the PSC has potentially discounted other formulas that may be more equitable or impose less of a burden on the petitioners. In effect, the PSC had prejudged the issue and prevented the petitioners from having a fair say on how their reimbursement formula should be derived.

### D. Retroactivity

In addition to arguing insufficiency of notice, petitioners contend the FY 2003 and FY 2004 assessments were impermissibly retroactive. A regulation is retroactive when "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (applying this retroactivity definition to a statute). *See also Peterson v. District of Columbia Lottery & Charitable Games Control Bd.*, 673 A.2d 664, 669 (D.C.1996) (adopting the *Landgraf* formulation and applying it to an agency regulation); *Chadmoore Commc'ns, Inc. v. FCC*, 324 U.S.App. D.C. 282, 287, 113 F.3d 235, 240 (1997) (stating that a rule is retroactive when it impairs rights a party possessed when it acted, increases a party's liability for past conduct, or imposes new duties for completed transactions). The traditional presumption against retroactivity has "consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact." *Landgraf*, 511 U.S. at 270, 114 S.Ct. 1483. This court has recognized

a "fundamental unfairness" when new regulations are applied retroactively. *Reichley v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 244, 248 (D.C. 1987) (internal citation omitted).

"[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by [the legislature] in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). *See also Peterson*, 673 A.2d at 669 (adopting the *Bowen* reasoning).[11] Section 34–912(b)(2) gives the PSC the right to promulgate a formula (a rule) by which the electricity suppliers will be assessed. However, there is nothing in § 34–912 that explicitly allows the PSC to engage in retroactive rulemaking. Indeed, the statute suggests the contrary as it provides that "[a]ll amounts appropriated for ... each fiscal year ... shall be repaid during such fiscal year ...." D.C.Code § 34–912(b)(1).

In the instant case, the PSC has conceded that the August 22, 2003, attempt at rulemaking was procedurally deficient as it simply announced the reimbursement fee. The PSC did not actually propose a formula under which an assessment could be made until August 5, 2004, over ten months after the close of FY 2003, which ended on September 30, 2003. By first proposing a rule under which the petitioners were to be assessed almost a year after the completion of FY 2003, the PSC was increasing the petitioners' liability for past conduct and imposing new duties with respect to a transaction that had already been completed, namely FY 2003. We

---

11. "Though not strictly bound to do so, this court has consistently looked to Supreme Court law for guidance in this area." *Peterson*, 673 A.2d at 669 n. 6.

therefore conclude that the rulemaking for FY 2003 was impermissibly retroactive.

 The PSC argues that the problem is unavoidable because an assessment issued toward the end of a fiscal year is inherently retroactive—it attempts to recover a budget which has already been largely spent. Once again, the PSC blurs the distinction between a rule and an assessment, between administrative rulemaking and administrative adjudication. A rule is not retroactive merely because it is designed to draw upon antecedent facts. *Regions Hosp. v. Shalala*, 522 U.S. 448, 456, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998); *Bell Atlantic Tel. Cos. v. FCC*, 316 U.S.App. D.C. 395, 407, 79 F.3d 1195, 1207 (1996). In the instant case, application of the rule (the formula) to calculate an assessment requires the PSC to rely on antecedent facts such as the amount of its previous budget and the electricity suppliers' shares of the market, but use of those antecedent facts does not make the rule itself retroactive. Although the process of calculating a reimbursement fee (an adjudication) may be retroactive in nature, the formula under which the assessments are calculated (the rule) may not be imposed retroactively. The proper course of action would have been for the PSC to promulgate a rule prior to FY 2003 and to apply that rule during FY 2003 to assess the petitioners for their shares of the PSC and OPC budgets.[12]

Nor can the PSC collect the FY 2004 assessments. It is true that the PSC gave notice of the proposed formula and the proposed assessments before FY 2004 had ended. Nevertheless, we have already concluded that the rulemaking upon which the FY 2004 assessments were based was procedurally flawed by insufficient notice to affected parties. To now give proper notice of a proposed rule and apply that new rule to FY 2004 would constitute retroactive rulemaking. That issue was the subject of *Georgetown Univ. Hosp. v. Bowen*, 261 U.S.App. D.C. 262, 821 F.2d 750 (1987), *aff'd on other grounds*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Under the program at issue in *Bowen*, the government would reimburse health care providers for expenses they incurred in providing medical services to Medicare beneficiaries. At times, the government would pay the health care providers more than they were entitled to, and, by federal statute, the Secretary was allowed to seek reimbursement for the overpayments. In 1981, the Secretary of Health and Human Services promulgated a rule designed to further the program, but the rule was found to be procedurally deficient, as the Secretary had failed to properly give notice and an opportunity for comments. The trial court struck down the 1981 rule as violative of the federal APA.

In 1984, the Secretary proposed the same rule as his predecessor had in 1981, this time with proper notice and comment procedures, and made the rule retroactive to 1981, hoping to collect all overpayments since that time. The D.C. Circuit held this to be forbidden retroactive rulemaking. *Id.* at 265, 821 F.2d 750 821 F.2d at 753. The court concluded that "agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to 'reissue' that rule on a retroactive basis." *Id.* at 270, 821 F.2d at 758. Affirming the judgment of the D.C. Circuit, the Supreme Court explained that "[i]n effect, the Secretary had promulgated a rule retroactively, and the net result was as if the original rule had never been set aside." 488 U.S.

12. We do not decide whether it would be permissible to adopt a rule during a particular fiscal year and then apply it to issue an assessment for the same year.

at 207, 109 S.Ct. 468. Applying the reasoning of *Bowen*, which addressed circumstances analogous to ours, we hold that an attempt to assess for the FY 2004 budgets under a rule yet to be validly promulgated would be impermissibly retroactive.[13]

### III. Conclusion

For the reasons discussed, we hold that the PSC's assessments of the petitioners for FY 2003 and FY 2004 were procedurally invalid. Petitioners are entitled to a refund of their money. We therefore remand these assessment orders to the PSC for proceedings consistent with this opinion.

*So ordered.*

---

**13.** The PSC argues that there is no unfair surprise to petitioners because D.C.Code § 34–912(b), as amended, became effective in 2000 and clearly obligated electricity suppliers to reimburse the District for a portion of the PSC and OPC budgets. A similar argument was made in *Bowen* because a statute authorized the Secretary to promulgate cost-reimbursement regulations. The Supreme Court rejected the Secretary's argument that the statute "provides authority for the retroactive promulgation of cost-limit rules," 488 U.S. at 209, 109 S.Ct. 468, and we reject the PSC's argument here.