**WASHINGTON GAS ENERGY SERVICES, INC.,**
Petitioner,

v.

**DISTRICT OF COLUMBIA PUBLIC SERVICE COMMISSION,**
Respondent.

Nos. 06–AA–1145, 06–AA–1218.

District of Columbia Court of Appeals.

Argued April 10, 2007.
Decided May 3, 2007.

or necessary party.  *See Raskauskas v. Temple*   *Realty Co.,* 589 A.2d 17 (D.C.1991).

Karen B. Pancost, with whom Beverly J. Burke and Telemac N. Chryssikos, Washington, DC, were on the brief, for petitioner.

Marc J. Williams, with whom Richard A. Beverly, General Counsel, was on the brief, for respondent.

Elizabeth A. Noel, People's Counsel, and Sandra Mattavous–Frye, Washington, DC, filed a brief as amicus curiae for the Office of People's Counsel.

Before FARRELL and THOMPSON, Associate Judges, and ISCOE, Associate Judge of the Superior Court of the District of Columbia.*

FARRELL, Associate Judge:

These petitions concern the validity of a rule adopted by the District of Columbia Public Service Commission (the PSC or the Commission) setting forth the formula by which unregulated electricity and natural gas suppliers and telecommunications providers are assessed their portion of the statutorily-required reimbursement to the District of Columbia for the annual operating budgets of the PSC and the Office of People's Counsel (the OPC). The PSC originally adopted the formula by rulemaking in the late 1990's and applied it to the existing, publicly-regulated utilities in the District. However, in a series of legislative actions beginning in the year 2000, the Council of the District of Columbia effectively deregulated the retail supply of electricity and natural gas and the provision of telecommunications service in the District.[1] The PSC has since, by rule, extended ap-

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. *See* D.C.Code § 34–1501 *et seq.* (2001 & Supp. 2006) (electricity); *id.* § 34–1671.01 *et seq.* (Supp. 2006) (natural gas); and *id.* § 34–2001 et seq. (2001) (telecommunications).

plication of the formula to unregulated suppliers such as Washington Gas Energy Services, Inc. (WGES), the petitioner in this case.

In *Washington Gas Energy Servs., Inc. v. District of Columbia Public Serv. Comm'n,* 893 A.2d 981 (D.C.2006) (hereinafter *WGES I*), WGES and Pepco Energy Services, Inc. (PES), disputed reimbursement charges imposed on them under the rule for the fiscal years 2003 and 2004. Although they challenged the rule both substantively (as violating the relevant statute and as arbitrary or capricious) and procedurally, this court reached only the latter challenge, holding that the PSC had adopted the rule without complying with the notice and comment provisions of the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code § 2–501 *et seq.* (2001). *See WGES I,* 893 A.2d at 987–90.[2] Meanwhile,

> [i]n January of 2005, the PSC [had] essentially started the rulemaking process anew by publishing notice in the D.C. Register that it was undertaking a rulemaking to establish a formula for assessments of electricity suppliers. 52 D.C.Reg. 584 (Jan. 21, 2005). Following the deregulation of gas suppliers in early 2005, the PSC amended its proposed rule in May of 2005 to include gas suppliers. 52 D.C.Reg. 4618 (May 13, 2005).

*Id.* at 984 n. 1. From that rulemaking arises the instant petition for review, in which WGES (not joined this time by PES) challenges the rule—and the formula it contains—on two grounds: first, that the rulemaking again violated the DCAPA, this time because the PSC, "though it went through the required motions, has not engaged in true notice and comment rulemaking" in that it "disregarded" comments received that opposed the formula previously adopted (Br. for Pet. at 6); and second, that the formula adopted is arbitrary or capricious and in violation of the governing statute, D.C.Code § 34–912(b). We hold that the PSC violated no duty to keep an "open mind" in considering the comments to the proposed rule, and adequately addressed those comments in writing. We further hold that the rule as adopted is neither prohibited by statute nor arbitrary or capricious.

## I.

D.C.Code § 34–912(b)(1) (2007) provides, as relevant here:

> All amounts appropriated for the [PSC] and the [OPC] for each fiscal year ... shall be repaid ... by [the public utilities,] the natural gas suppliers, electricity suppliers and telecommunications services providers as a reimbursement fee.[3]

In explaining how the reimbursement is to be calculated, section (b) further distinguishes between the unregulated (also variously termed by the parties "alternative" or "competitive") suppliers or providers and the regulated public utilities, including Pepco and Washington Gas Light Company:

> (2) The amount of the reimbursement fee to be paid by each natural gas supplier, electricity supplier, and local [telecommunications] exchange carrier, that is not the incumbent local exchange carrier[,] ... authorized to provide service in the District, and the formula through

---

2. The court further held that application of the invalidly promulgated rule to the challengers in their 2003 and 2004 assessments was impermissible retroactive rulemaking. *See WGES I,* 893 A.2d at 990–92.

3. As the court pointed out in *WGES I,* the omission of the term "public utilities" from this section was plainly a "scrivener's error." *See* 893 A.2d at 985 n. 3.

which such an amount shall be annually established, shall be determined by the [PSC].

(3) The amount of the reimbursement fee to be paid by each public utility ... shall be equal to the product of the amounts appropriated, less the amount to be reimbursed by the providers subject to paragraph (2) of this subsection, multiplied by the fraction ... represented by the revenues of such public utility derived from utility operations in the District ... that are regulated by the [PSC] during the immediately preceding fiscal year ... divided by the gross revenues of all public utilities from utility operations in the District ... during such period.

Thus, while the statute prescribes a formula based on gross revenues for calculating the public utilities' portion of the total reimbursement, it leaves to the PSC to determine how an alternative supplier's contribution is to be calculated.[4]

Exercising this statutory authority, the PSC in January 2005 proposed to amend 15 DCMR § 1301.1 to provide, in pertinent part, as follows:

Each public utility, competitive electric supplier, and competitive local exchange carrier ("CLEC") shall be assessed a fraction of the reimbursable budgets of the [PSC] and [OPC] equal to the ratio of that utility's, competitive electric supplier's, or CLEC's calendar year gross revenues to the sum of the calendar year gross revenues of all public utilities, competitive electric suppliers, and CLECs.

The PSC received comments on the proposed rule from WGES, PES, the OPC, and others. In May 2005, it amended the proposed rule to cover "competitive natural gas supplier[s]" as well, and again received comments on the proposed rule from WGES, PES, and others. On May 10, 2006, the PSC issued Order No. 13940, which adopted the final rule as proposed. The PSC explained, in summary, that it "has carefully considered all of the comments, including those that suggested alternative assessment formulas. . . . It is our view that, although the gross revenue assessment method may not be perfect, it is, all things considered, the most reasonable method for equitably assessing companies at this time."

WGES and PES filed for reconsideration of Order No. 13940, which the PSC granted. In August 2006, it issued Order No. 14019 which requested comment on a proposed amendment to the adopted rule "to better conform [it] to the statutory language." Specifically, "because the statute contemplates an assessment against unregulated suppliers, [then] subtracting that amount from the appropriation, and assessing the remainder against public utilities based on the proportion of their individual gross revenue to the aggregate gross revenue of all public utilities" (internal quotation marks omitted), the proposed

4. The statute goes on to explain how refunds shall be computed in the event reimbursements exceed the agency expenses:

If the total amount paid or obligated by the Public Service Commission and the People's Counsel during such fiscal year pursuant to appropriations for such fiscal year is less than the amounts appropriated by more than 5%, the Mayor shall refund to or credit each public utility, natural gas supplier, and electricity supplier with such part

of the difference ... as equals the product of the difference multiplied by the fraction, as set forth above, representing the gross revenue of the public utility or electricity supplier relative to the gross revenues of all public utilities, natural gas suppliers, and electricity suppliers.

D.C.Code § 34–912(b)(3). The omission of telecommunications providers from this portion of the statute may (or may not) be another scrivener's error. See note, *supra*.

rule, as amended, would read in relevant part:

Each public utility, competitive electric supplier, competitive natural gas supplier, and competitive local exchange carrier ("CLEC") shall be assessed according to D.C.Code Section 34–912(b) for the reimbursable budgets of the Commission and the People's Counsel in the following manner:

(a) For CLECs, competitive electric suppliers, and competitive natural gas suppliers (collectively "alternative providers"), the assessments shall be equal to the ratio of the alternative provider's calendar year gross revenues to the sum of the calendar year gross revenues of all public utilities and all alternative providers times the budgets of the Commission and OPC.

(b) For public utilities, the assessment shall be the utility's proportionate share of the calendar year gross revenues of all public utilities times the budgets of the Commission and OPC less the amount to be reimbursed by the alternative providers in subsection (a).

WGES moved to reconsider Order No. 14019 and, when the PSC denied that application, filed this petition for review.

## II.

As this account of the rulemaking shows, the PSC proposed and ultimately adopted a revenue-based formula for reimbursement that assesses unregulated electricity and natural gas suppliers (and unregulated telecommunications providers) for their portion of the PSC and OPC budgets in the same manner as the Commission does the regulated utilities. That is to say, although the procedure dictated by § 34–912(b)—and embodied in the final rule—is a two-step one requiring calculation first of the reimbursement owed by the alterna-

tive (or competitive) suppliers, and then of the remainder owed by the public utilities, the assessments in each case are based on gross revenues of individual companies in relation to aggregated revenues of all suppliers and/or utilities.

WGES makes two main attacks upon the rule as adopted: first, procedurally, it argues that the PSC paid only lip-service to the notice and comment requirements of the DCAPA, essentially conducting that process with a mind already made up in favor of the reimbursement formula already chosen; and second, substantively, it claims that the rule as adopted is arbitrary and capricious and not in accordance with the statutory scheme. We consider these arguments in order.

## A.

As we pointed out in *WGES I*, the formula proposed by the PSC in the January 2005 notice of rulemaking was the same revenue-based one the Commission had devised for assessing public utilities in the pre–2000 regulatory scheme, *WGES I*, 893 A.2d at 986, and had used to assess WGES and PES unlawfully in 2003 and 2004. WGES now argues that, having committed itself to the formula initially and having ignored proper procedure in applying it for those years, the PSC was required to "make a compelling showing" that when it later gave notice of the rule and received comments, "it considered [those] comments with an open [mind]," quoting *Advocates for Highway & Auto Safety v. Federal Highway Admin.*, 307 U.S.App. D.C. 421, 425, 28 F.3d 1288, 1292 (1994) (internal quotation marks omitted). According to petitioner, the PSC failed to make that showing.

D.C.Code § 2–505(a) requires that "each independent agency shall, prior to the adoption of any rule[,] . . . publish in

the District of Columbia Register ... notice of the intended action so as to afford interested persons opportunity to submit data and views...." Like its federal counterpart,[5] § 2–505(a) "does not expressly require agencies to keep an 'open' mind, whatever such a subjective term might mean." *Mortgage Investors Corp. of Ohio v. Gober,* 220 F.3d 1375, 1379 (Fed.Cir. 2000). What the statute does require is (a) an opportunity for interested persons "to participate ... through submission of written data, views, or arguments," and (b), implicitly, "consideration [by the agency] of whatever data and views are submitted." *Id.* Indeed, "[s]uch consideration has been considered to demonstrate an 'open mind.'" *Id.* (quoting *Advocates for Highway & Auto Safety,* 307 U.S.App.D.C. at 426, 28 F.3d at 1293); *see also Necketopoulos v. Shalala,* 941 F.Supp. 1382, 1393 (S.D.N.Y.1996) (rejecting argument that Secretary of HHS had not "ke[pt] an open mind before receiving public comment"; rather, she "gave appropriate consideration to the comments she received," and it is not "the role of the courts to police the mindset of the Secretary if she otherwise follows appropriate rulemaking procedures").

■ Thus, we inquire whether the PSC gave fair consideration to the comments received in the informal rulemaking, without placing a thumb on the scale, so to speak, against the agency because it ultimately adopted a rule it had adopted and applied originally in violation of the DCAPA. Put another way, "[w]hile changes and revision [after comment] are indicative of an open mind, ... an agency's failure to make any does not mean its mind is

closed." *Advocates for Highway & Auto Safety,* 307 U.S.App. D.C. at 425, 28 F.3d at 1292. It is undisputed that, in January 2005, the PSC gave required notice of its intent to adopt the revenue-based formula as applied to the unregulated suppliers or providers and the regulated utilities alike. Between May and October 2006, it issued three separate orders responding to comments, setting forth alternative assessment formulas that had been suggested by commenters, and explaining why, in sum, it had concluded that "the gross revenue assessment method ... is, all things considered, the most reasonable method for equitably assessing companies at this time."

■ An agency "need only state the main reasons for its decisions and indicate that it has considered the most important objections." *American Horse Prot. Ass'n v. Yeutter,* 286 U.S.App.D.C. 372, 376, 917 F.2d 594, 598 (1990) (citation and quotation marks omitted); *see also Covad Communications Co. v. FCC,* 371 U.S.App.D.C. 283, 305, 450 F.3d 528, 550 (2006) (citation and quotation marks omitted) ("The [agency] need not address every comment, but it must respond in a reasoned manner to those that raise significant problems."). The principal objection made to the gross-revenue based formula was that it bore no relationship to the costs incurred by the PSC and the OPC in relation to the unregulated suppliers. As WGES's initial comment stated: "The proposed rule is not linked to cost causation. Cost causation is the hallmark of Commission ratemaking and rate of return regulation. [It] should not be abandoned with respect to assessments of competitive electricity [or natural gas] suppliers." We think the PSC satis-

---

5. As "the DCAPA requirements as to notice and comment are closely analogous to the requirements of the Federal Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1977), for an informal rulemaking proceeding," *Citi-*

*zens Ass'n of Georgetown v. Zoning Comm'n of the District of Columbia,* 392 A.2d 1027, 1038 (D.C.1978), we look to them for necessary guidance.

factorily answered this objection. First, it found nothing in the authorizing statute that required it "to base the assessment formula for non-public-utilities on something other than gross revenues," the formula historically used for public utilities. Moreover, the Commission explained that "an 'actual regulation' method" might not recapture "general costs" of the agency not attributable to either class of utilities, illustratively those arising from "general functions ranging from routine administrative tasks to monitoring and participating in proceedings before the Federal Energy Regulatory Commission and the Federal Communications Commission." As to such functions "requir[ing] the use of staff time which must be reflected in the operating budget and ... recovered," the "allocation of costs would be extremely complicated and contentious, to the extent that such an approach would be impractical and inappropriate."

WGES argues that the PSC misunderstood its objection as suggesting that the Commission should adopt a cost-causation method specific, not to the two utility classes (regulated or unregulated), but to individual companies—a method it concedes might indeed be "complicated and ... impractical." The point is well taken, because the PSC at one place does say that "[w]e ... reject the argument that the amount assessed against *a particular company* should be proportionate" (emphasis added). However, in its application for reconsideration WGES pointed out this misapprehension, and in response the

PSC, while acknowledging that it "under[stood] WGES's position regarding assessments to alternative providers," reiterated its view that allocating its expenses to particular regulatory functions, in turn related to a single class of utilities, could "unreasonably shift ... costs" and be "complicated and ... impractical and [therefore] inappropriate." Moreover, the Commission was troubled by the absence of a "logical relationship" between reimbursement and refunds, see note, *supra*, if the revenue-based formula were to govern one but not the other. We conclude that the PSC adequately considered and responded to the comments objecting on the ground of lack of proportionality.

■ WGES further asserts that the PSC failed to respond at all to its comments about the anti-competitive nature of the proposed formula—*i.e.*, the disincentive it would create for non-regulated suppliers to enter the D.C. market if forced to bear costs unrelated to any regulation of them—and pointing out the negative impact the formula would have on consumers who choose to buy their energy from an alternative supplier.[6] The PSC did respond that it had "consider[ed] the effect an assessment to alternative providers based on gross jurisdictional revenues may have on current alternative providers as well as on new market entrants," and also "the effect on the District's consumers of assessments" based on the same formula. WGES's objection is that this is all the

---

**6.** In this regard WGES had commented:
[Regulated u]tilities are expressly allowed to recover assessments in their rates, and unregulated suppliers will consider it a cost of doing business, like rent, that must be recovered from its customers. Because both Pepco and Washington Gas Light Company recover assessments in their distribution charges, but not in the rates for the electricity or gas itself, consumers are

treated unequally. A Pepco customer pays assessments in his distribution charge only. A WGES customers pays the same distribution charge as the Pepco customer, but also pays a part of the WGES assessment. It is unfair and unjust that the two customers should be treated unequally. It is even more unjust that the customer of the unregulated entity should pay *more* than the customer of a utility. (emphasis in original).

PSC said in response—that it did not explain why it had not just "considered" but rejected those comments. But, in our view, the PSC could reasonably regard these points as subsidiary to WGES's main contention that unregulated suppliers were being unfairly assessed with expenses attributable to regulation of the public utilities—expenses the former would have to pass on to customers at a sacrifice to their competitiveness. As stated previously, an agency is not required "to respond to every comment, or to analyse every issue or alternative raised by the comments," *Thompson v. Clark*, 239 U.S.App. D.C. 179, 186, 741 F.2d 401, 408 (1984). The PSC received, considered, and responded to comments not just from WGES and PES but from other interested parties as well.[7] It modified the formula on reconsideration to make it reflect more clearly the two-step procedure dictated by § 34–412(b)—though admittedly not in a manner that satisfied WGES. Finally, it declared itself "willing to consider other plausible options to assessments to alternative providers based on gross ... revenues, such as the tiered formula preferred by WGES," but not "at this time," and even established an Assessment Working Group empowered "to continue meeting ... and suggest any modifications to the assessment regulations that it deems appropriate."

All told, the PSC met its statutory duty to receive, consider, and address in writing "the most important objections" to the proposed rule. *American Horse Prot. Ass'n, supra.* That is all the DCAPA required.

## III.

In challenging the rule substantively, WGES first argues that it contradicts D.C.Code § 34–912(b) because the legislature logically would have prescribed the same revenue-based formula for assessing both kinds of utilities if that is what it had intended. Instead, by committing to the PSC selection of the formula to be applied to unregulated suppliers, it signaled—in WGES's view—that a different formula should be employed. We do not think that follows. Entrusting the PSC with the decision of how to assess the unregulated companies may have reflected nothing more than the D.C. Council's recognition that (in one commenter's words) "the newly competitive market" *could* "require changes to the way the Commission imposes assessments," but not necessarily. Given that questions such as how many alternative suppliers would seek PSC licensing, and more importantly, how much practical oversight the Commission would have to exercise regarding them were still unanswered, the Council may have concluded—and we think in all probability did—that only the PSC was in a position to decide whether a different formula was called for and, if so, what it should be in assessing the new suppliers.

Section 34–912 (b) aside, WGES argues that the rule does not withstand the test of D.C.Code § 34–606, which requires the court to invalidate an order or decision of the PSC that is "unreasonable, arbitrary, or capricious." Our review under that test, however, is very limited. We have consistently described it as " 'the narrowest judicial review in the field of administrative law.' " *WGES I,* 893 A.2d

---

7. Those comments, and the PSC's responses, concerned matters such as the claimed ambiguity of the term gross revenues, how assessments would be computed for providers of both electricity and natural gas, whether the competitive suppliers assessed should include electricity brokers/aggregators, and whether the periods for refunds of assessments should be shortened.

at 986 (quoting *Office of People's Counsel v. Public Serv. Comm'n,* 610 A.2d 240, 243 (D.C.1992)). Of course, that limitation applies particularly "in a complex, esoteric area such as ratemaking," *Office of People's Counsel, supra,* and no one argues that the method for assessing reimbursement of the agency's operating expenses entails complexity of that kind.[8] Nevertheless, especially given the legislative judgment to leave the reimbursement formula for unregulated suppliers to the PSC's determination, its choice of a formula must receive very substantial deference.[9]

■ The revenue-based rule chosen by the PSC is not unreasonable, arbitrary, or capricious. It concerns not ratemaking, licensing, oversight, or indeed any aspect of the Commission's regulatory role as such, but instead only the issue—one is tempted to say the mundane issue—of how the agency is to be reimbursed for its annual operating costs. In making that determination, the PSC could reasonably decide that a uniform, easily-administrable yet proportional formula (proportional to revenue) that tracked the statutorily-prescribed method for assessing the public utilities should apply to all licensed companies, without allocation based on the type or magnitude of services the agency devotes to one class of utility and not the other. We were told at oral argument that as many as thirty alternative suppliers or providers are currently licensed by the PSC. It is not argued that they require the oversight attention of the agency in anything like equal proportion to the regulated utilities, and yet the duties of the PSC concerning them, as enumerated in the governing statutes, are not negligible.[10] The very uncertainty of how much practical oversight the PSC would have to exercise in regard to these entities in a newly competitive market was reason for the Commission to eschew a cost-based distinction, at least for now, in deciding how its administrative costs would be recaptured. Furthermore, as the PSC recognized, § 34–912(b) itself provides a key

8. Further, as we stated in *WGES I,* "[w]e owe no such deference to the PSC with respect to its compliance with the DCAPA," 893 A.2d at 986, but we have accorded it none here in deciding that the Commission properly complied with the notice and comment requirements of that statute.

9. Even as to administrative agencies generally, "[t]he 'arbitrary and capricious' standard of review ... in the APA is highly deferential, as the words suggest, and we are to presume the validity of agency action." *American Horse Prot. Ass'n,* 286 U.S.App.D.C. at 374, 917 F.2d at 596.

10. The PSC's involvement in the supply and sale of electricity and natural gas by unregulated suppliers entails, in part: (1) the adoption of regulations or the issuance of orders to, *inter alia,* govern the licensing of electricity and natural gas suppliers, implement consumer protections and competitive billing, and "[e]stablish procedural rules for complaints, investigations, and dispositional hearings"; (2) the "develop[ment] and maint[enance of] information regarding rates charged and services provided by licensed electricity [and natural gas] suppliers to ... residential customers" "formatted to provide a comparison of rates and services" and "[m]ade available to the public through the ordinary means of publication of the Commission, including posting on the Internet"; (3) "jurisdiction over complaints regarding licensed [electricity and] natural gas suppliers," including conducting hearings and investigations as well as imposition of penalties "for any violation of this chapter or any regulation or order adopted or issued by the Commission"; and (4) "monitor[ing] the District of Columbia retail markets for [electricity and] natural gas supply and sales declared by the Commission to be potentially competitive services to ensure that the markets are not being adversely affected by anticompetitive conduct and anticompetitive conditions." D.C.Code §§ 34–1501 *et seq.,* & –1671.01 *et seq.*

to a reasonable formula in the manner in which it computes refunds of excess-reimbursements. See note, *supra.* As the Commission stated, "because the amount of any refund must be based on a company's gross revenues, it is certainly reasonable to use gross revenues as the basis for the assessment formula. Indeed, eliminating gross revenues from the assessment formula would result in a refund that has no logical relationship to the original amount of the assessment."

WGES further argues, as mentioned earlier, that the revenue-based formula is anti-competitive by taxing alternative suppliers with costs the PSC has not incurred in regard to them, and penalizes consumers who purchase their energy supply from them because regulated utilities such as Pepco still pass on their assessment through the distribution charge to all utility customers. See note, *supra.* As stated earlier, however, the PSC took note of these objections and was not convinced that they presently require a different formula. The premise of deregulation is that alternative suppliers will find strong business incentives to enter the local energy (and telecommunications) market, and that consumers are mature enough to determine their own economic advantage in how they purchase energy. The PSC was not convinced that a uniform, revenue-based approach merely to recouping its administrative costs would affect significantly the decisions that either companies or consumers will make in this regard. This court does not have the expertise to supplant that judgment with its own.

*Affirmed.*